IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANNA LASKO, | ) | Case No. 1:19-cv-542 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| MOBILE HYPERBARIC CENTERS, | ) | |
| LLC, *et al.*, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendants. | ) | |

Plaintiff Anna Lasko has Complex Regional Pain Syndrome ("CRPS"), which caused her to have foot pain and hypersensitivity to sound.  From January through February 2017, Lasko received hyperbaric oxygen therapy for her CRPS-related foot pain at Mobile Hyperbaric Centers, LLC ("Mobile Hyperbaric").  On February 12, 2019, plaintiff Anne Lasko sued Mobile Hyperbaric, Dr. Michael Huber (the "Defendants"), and several yet unnamed parties in Cuyahoga County Court of Common Pleas.  ECF Doc. 1-1.  In her complaint, Lasko alleged that the Defendants discriminated against her in violation of Ohio Revised Code § 4112.02(G) and the Americans with Disabilities Act, 42 U.S.C. § 12128(b)(1)(A)(i), when: (1) staff at Mobile Hyperbaric refused to reduce the volume of a treatment room television ("TV"), change its channel, or turn it off to accommodate her hypersensitivity to sound; and (2) Dr. Huber cancelled her remaining treatments.  ECF Doc. 1-1.  On March 13, 2019, the Defendants removed the case to this court, invoking this court's diversity jurisdiction under 28 U.S.C. § 1332(a).  ECF Doc. 1.

On April 24, 2019, the parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c).  ECF Doc. 7.

Now pending before the court are: (1) Lasko's motion to dismiss this case without prejudice (ECF Doc. 24); (2) the Defendants' motion for summary judgment (ECF Doc. 28); (3) two motions to strike (ECF Doc. 33; ECF Doc. 37); and (4) a motion for reconsideration of an order denying a motion to extend the time to respond to a motion to strike (ECF Doc. 46). For the reasons discussed below, Lasko's motion to dismiss this case without prejudice (ECF Doc. 24) must be DENIED.  The Defendants' motion to strike (ECF Doc. 33) must be GRANTED in part and DENIED in part.  Lasko's motion to strike (ECF Doc. 37) must be DENIED.  The Defendants' motion for summary judgment (ECF Doc. 28) must be GRANTED. Lasko's motion for reconsideration (ECF Doc. 46) must be DENIED AS MOOT.  And the court *sua sponte* will DISMISS all claims against the yet unnamed fictitious parties (John Does 1-5 and ABC Companies 1-5).

I.      **Motion to Dismiss Without Prejudice**

Lasko asks that the court dismiss this case without prejudice under Fed. R. Civ. P. 41(a)(2) because the twice-extended discovery period has closed, and she still wishes to conduct discovery.  ECF Doc. 24 at 1.  Lasko also asserts that, at the time of her motion, counsel had not received the client file from her previous counsel.  ECF Doc. 24 at 1.  Lasko contends that dismissal of this case without prejudice would not prejudice the defendants because they conducted only paper discovery, took only a single deposition, and had not yet filed dispositive motions at the time her motion was filed.  ECF Doc. 24 at 1.

The Defendants respond that that dismissal without prejudice would be improper in this case because they already incurred significant expenses in discovery, they prepared a motion for

summary judgment (which was due on the day after the deadline to respond to Lasko's Rule 41 motion), and Lasko's wish to circumvent the court's scheduling order is not an appropriate use of Rule 41. ECF Doc. 26 at 5-9. Further, the Defendants argue that any complications with Lasko's change of counsel – changing counsel just over one week before the discovery deadline and switching back to original counsel after the discovery deadline had passed – were of her own making and do not justify dismissal without prejudice on the eve of summary judgment. ECF Doc. 26 at 7.

Under Rule 41(a)(2), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. . . . Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice." Fed. R. Civ. P. 41(a)(2). District courts have wide discretion in determining whether a motion to dismiss under Rule 41(a)(2) should be granted, whether such dismissal should be with or without prejudice, and whether any conditions should be imposed. *See Bridgeport Music, Inc. v. Universal-MCA Music Publ'g, Inc.*, 583 F.3d 948, 954 (6th Cir. 2009) ("A Rule 41(a)(2) dismissal may be conditioned on whatever terms the district court deems necessary to offset the prejudice the defendant may suffer from a dismissal without prejudice."); *Wellfount, Corp. v. Hennis Care Ctr. of Bolivia, Inc.*, 951 F.3d 769, 774 (6th Cir. Mar. 3, 2020) ("The district court may deny the motion, require that a dismissal be with prejudice, or impose any other conditions that it 'deems necessary.'"). In determining whether a Rule 41(a)(2) motion should be granted and whether conditions should be imposed, courts typically consider: (1) the defendant's efforts and expenses in litigating the case; (2) the plaintiff's delay or diligence in prosecuting the action; (3) whether the plaintiff has provided a sufficient explanation for the need to dismiss the action; and (4) whether the action has already progressed to dispositive motions. *See Bridgeport Music, Inc.*, 583 F.3d at 953.

3

The court agrees that dismissal of this case without prejudice would be improper.  Lasko delayed filing her motion until the eve of the summary judgment filing deadline, at which time the Defendants had incurred the expenses of discovery, twice agreed to discovery extensions to allow Lasko to conduct the discovery that she had neglected, and prepared a motion for summary judgment.  Further, dismissal of this case without prejudice would prejudice the Defendants when, as discussed in more detail below, the Defendants are entitled to summary judgment on the grounds that: (1) Lasko lacks standing under Title III of the ADA; and (2) abstinence from loud noise due to sound sensitivity is not a "substantial limitation" on a "major life activity" under Ohio law.

Accordingly, Lasko's motion to dismiss this case without prejudice (ECF Doc. 24) must be DENIED.

## II.    Motions to Strike

Before proceeding to consider the Defendants' motion for summary judgment, this court must resolve: (1) the Defendants' motion to strike certain evidence appended to Lasko's opposition brief (ECF Doc. 33); and (2) Lasko's motion to strike Dr. Huber's affidavit and Exhibit B to that affidavit, which were appended to the Defendants' motion for summary judgment (ECF Doc. 37).

### A.    Motion to Strike Standard of Review

Because resolution of a motion to strike affects the scope of evidence that might be considered at the summary judgment stage, the court must rule upon any such motions before resolving a motion for summary judgment.  *See Zerman v. City of Strongsville*, No. 1:04-cv-2493, 2006 U.S. Dist. LEXIS 70503, at *20-21 (N.D. Ohio, Sept. 28, 2006) (O'Malley, J.); *Morrison v. Bd. of Trs.*, 529 F. Supp. 2d 807, 818 (S.D. Ohio 2007).  Such

4

motions may argue that evidence relied upon in support of or opposition to a motion for summary judgment is inadmissible.  Fed. R. Civ. P. 56(c)(2); *see*, *e.g.*, *Cary v. Cordish Co.*, 31 F. App'x 401, 405-06 (6th Cir. 2018) (a district court may refuse to consider inadmissible hearsay); *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (sham affidavits contradicting prior sworn testimony may be inadmissible at the summary judgment stage).

A district court may also "impose appropriate sanctions" for evidence submitted in support or opposition to a motion for summary judgment if the proponent of that evidence failed to comply with Fed. R. Civ. P. 26(a) (initial disclosures) or Fed. R. Civ. P. 26(e) (supplemental disclosures and responses to interrogatories, requests for production, and requests for admission). Fed. R. Civ. P. 37(c)(1); *Emanuel v. Cty. of Wayne*, 652 F. App'x 417, 424-25 (6th Cir. 2016). Such sanctions could include, among other things, exclusion of the evidence from consideration, prohibiting the non-disclosing party from using the evidence to support or oppose claims or defenses, and striking the evidence.  Fed. R. Civ. P. 37(b)(2)(A)(ii); *Emanuel*, 652 F. App'x at 424.  A proponent of evidence subject to exclusion under Fed. R. Civ. P. 37(c)(1) may overcome exclusion only if she can show that her failure to comply with the discovery rules was harmless or substantially justified.  *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004).  Whether a failure to disclose evidence was harmless or substantially justified, courts in this circuit look to five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs. Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)).

5

B.      **Defendants' Motion to Strike**

1.      **The Parties' Arguments**

The Defendants argue that the court should strike from the record the following

documents:

| ECF Doc. No. | Description |
|---|---|
| 30-1 at 1-4 | Harvard Health Publishing CPRS Article (Page ID# 756-59) |
| 30-1 at 5 | Pennsylvania Disability Parking Placard No. P959187 (Page ID# 760) |
| 30-1 at 6 | Medical Infirmity Certificate dated April 25, 2014 (Page ID# 761) |
| 30-1 at 7 | Medical Notes from Thomas M. Sisk, MD (Page ID# 762) |
| 30-1 at 8-12 | Medical Notes from Yaaqov M. Abrams, MD (Page ID# 763-67) |
| 30-1 at 12-16 | Medical Notes from Terence W. Starz, MD (Page ID# 768-71) |
| 30-1 at 17-21 | Medical Notes from Jennifer L. Nichols, MD (Page ID# 772-76) |
| 30-1 at 23-26 | Medical Notes from Nicole Vogini, DPT (Page ID# 778-81) |
| 30-1 at 27 | June 26, 2020 Letter from Karl E. Bushman, MD (Page ID# 782) |
| 30-1 at 57-60 | ComForcare Flowsheet, Scooter Packing Slip, and Photo (Page ID# 812-16) |
| 30-1 at 63-71 | Photos and United Healthcare Letter (Page ID# 818-27) |
| 30-3 | Miscellaneous Letters to and from Plaintiff (Page ID# 839-857) |
| 30-4 | Certificates, Articles, Photos, Letters, Educational Info (Page ID# 858-95) |
| 30-5 | Articles Regarding Hyperbaric Surgery (Page ID# 896-908) |
| 30-7 | Hyperbaric Guidelines Documents and Manual (Page ID# 1091-1248) |
| 31 | Video #1, Video #4[1], and Video #5 |

ECF Doc. 33 at 8-9.  The Defendants contend that these items should be stricken from the record

pursuant to Fed. R. Civ. P. 37(c)(1) and not considered for purposes of their motion for summary

judgment because those items and the names of any providers referenced therein were never

disclosed or produced to the defendants during discovery, notwithstanding the Defendants'

requests for those items.  ECF Doc. 33 at 12.  The Defendants also assert that Lasko cannot

excuse her failure to disclose the information because: (1) the information was in her possession;

and (2) multiple extensions were given for Lasko to produce the information before the

discovery period closed.  ECF Doc. 33 at 12-13.  Further, the Defendants argue that Lasko

---

[1] Video #4 is actually an audio recording, but the parties have referred to it as "Video #4" for ease of
analysis.  So, the court will, too.

should not be permitted to rely on Exhibits 5 and 7 (ECF Doc. 33-5; ECF Doc. 33-7) as expert

testimony because she did not identify any expert under Fed. R. Civ. P. 26.  ECF Doc. 33 at 13.

Lasko responds that the court should not strike any of the challenged evidence because it

either: (1) did not exist during the discovery period; (2) was not in her possession during the

discovery period; or (3) was a public record that will be used only to impeach affidavits attached

to the Defendants' motion for summary judgment.  ECF Doc. 36 at 6.  Lasko asserts that Videos

#1 and #2 were part of one of the original two videos produced to Defendants but were split for

purposes of Lasko's filing with the court.  ECF Doc. 36 at 2.  Lasko says that she did not know

she had Videos #4 and #5 until she searched a hard drive in her possession after the Defendants

filed their motion for summary judgment, the videos are important to her case, and the videos

should not surprise the Defendants or disrupt the trial.  ECF Doc. 36 at 7-8.  Lasko states that the

Defendants had access to the challenged medical records (ECF Doc. 30-1 at 7-21, 23-26, 63-71)

because she had executed HIPAA releases and she did not possess those records until after the

Defendants filed their motion for summary judgment.  ECF Doc. 36 at 4, 8.  The Defendants had

access to the communications in Exhibit 3 (ECF Doc. 30-3) because they were party to those

communications.  ECF Doc. 36 at 4, 8.  The documents in Exhibit 4 (ECF Doc. 30-4) were not

produced or available to the Defendants but are relevant to Lasko's activity level before her

CRPS diagnosis.  ECF Doc. 36 at 9.  And Lasko asserts that Exhibits 5 and 7 (ECF Doc. 30-5;

ECF Doc. 30-7) are "learned treatises" will be used only to rebut the Defendants' opinion

statements and do not require expert testimony.  ECF Doc. 36 at 9-10.

In their reply brief, the Defendants argue that they have no way to confirm whether

Videos #1 and #2 were part of the same video produced to them because Lasko has not produced

Videos #1 and #2 to them for comparison to the single video she had produced.  ECF Doc. 39 at

4-5.  The Defendants assert that Lasko also has never produced Video #4 and #5 – even after the motion to strike was filed – and that Lasko's excuses for failing to do so are unavailing because she has not explained her diligent efforts and the Defendants have not been given an opportunity to analyze and respond to the contents of those videos.  ECF Doc. 39 at 5-6.  The Defendants contend that the June 26, 2020 creation of Dr. Bushman's letter (ECF Doc. 30-1 at 27) did not excuse Lasko's failure to include it in a supplement to her discovery responses before submitting it in support of her opposition brief, and that producing "HIPPA [*sic*]" authorizations did not excuse her duty to disclose her providers or produce the documents requested in discovery.  ECF Doc. 39 at 7.  The Defendants argue that Lasko did not explain why her failure to disclose the documents in Exhibit 4 (ECF Doc. 30-4) was substantially justified or harmless.  ECF Doc. 39 at 7.  And the Defendants assert that Lasko was required to disclose the documents in Exhibits 5 and 7 (ECF Doc. 30-5; ECF Doc. 30-7) notwithstanding their public availability and that those documents are inadmissible hearsay.  ECF Doc. 39 at 8-9.

In her sur-reply, Lasko argues that she has now produced Videos #1-3, which contain the same content as the original two videos produce to the Defendants.  ECF Doc. 42 at 2.  Lasko admits that Video #4 was never produced to the Defendants but asserts that she should not be penalized for counsel's failure to produce the video after she had given the video to counsel. ECF Doc. 42 at 2-4.  Further, Lasko argues that consideration of Video #5 would not prejudice the Defendants because it is a recording of the Defendants and crucial to her arguments.  ECF Doc. 42 at 2-4.  Finally, Lasko contends that any assertion that she did not request a deposition of the Defendants is untrue because she had "requested depositions of Defendants after the close of discovery."  ECF Doc. 42 at 5.

2.      **Analysis**

*a.      Articles and Manuals*

The Defendants are correct that the lack of expert testimony in this case bars the

admissibility of the articles and manual (ECF Doc. 30-1 at 1-4; ECF Doc. 30-5; ECF Doc. 30-7)

that Lasko says are admissible as "learned treatises."  Statements in learned treatises are not

excluded by the rule against hearsay only when: "(A) the statement is called to the attention of an

expert witness on cross-examination or relied on by the expert on direct examination; and (B) the

publication is established as a reliable authority by the expert's admission or testimony, by

another expert's testimony, or by judicial notice."  Fed. R. Evid. 803(18).  But Lasko has not

shown that she called any expert's (or Defendants') attention to these materials in direct or

cross-examination, pointed to an expert report relying on the materials, had any of these

materials authenticated as reliable by an expert, or sought judicial notice that these materials are

reliable.  *See generally* ECF Doc. 36; ECF Doc. 42.  Lasko could have conceivably

accomplished such reliance and authentication if she had used the documents in a deposition, but

she did not request a deposition until the twice-extended discovery period had closed.  And,

although Lasko *could* conceivably use the documents at a trial by meeting the requirements of

Fed. R. Evid. 803(18) during cross-examination, that possible future use does not satisfy the

requirements for the learned treatise exception at this time.  Fed. R. Civ. P. 803(18).  Thus, the

articles and manual in (ECF Doc. 30-1 at 1-4; ECF Doc. 30-5; and ECF Doc. 30-7) are

inadmissible hearsay at this time and cannot be considered as part of the Rule 56 evidence.  Fed.

R. Civ. P. 56(c)(2); *Cary*, 31 F. App'x at 405-06.

b.      *Disability Placard and Medical Infirmity Certificate*

Lasko's response brief and sur-reply do not address whether: (1) she submitted the disability placard (ECF Doc. 30-1 at 5) or medical infirmity certificate (ECF Doc. 30-1 at 6) to the defendants in discovery; or (2) her failure to do so is harmless or substantially justified.  *See generally* ECF Doc. 36; ECF Doc. 42.  As a result, any such argument is forfeited at this time. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (explaining that an argument not raised before the district court is forfeited).

Accordingly, in the absence of any opposing argument, Lasko's disability placard (ECF Doc. 30-1 at 5) and medical infirmity certificate (ECF Doc. 30-1 at 6) are subject to exclusion under Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1) and cannot be considered as part of the Rule 56 evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 37(c)(1); *Emanuel*, 652 F. App'x at 424-25; *Dickenson*, 38 F.3d at 983.

c.      *Various UPMC Medical Records*

The challenged medical records from various UPMC providers (ECF Doc. 30-1 at 7-21) subject to exclusion under Rule 37(b)(2)(A)(ii), (c)(1).  With respect to the medical records, Lasko had two disclosure duties: (1) she needed to provide the name and known contact information for the "individual" that possessed the records, *see* Fed. R. Civ. P. 26(a)(1)(A)(i); and (2) she needed to provide "a copy – or a description by category and location" of any medical records that were in her "possession, custody, or control," *see* Fed. R. Civ. P. 26(a)(1)(A)(ii).  And, because the Defendants requested production of "any and all medical records" from the October 2014 forward, Lasko was required to disclose any such medical records that were in her "possession, custody, or control."  ECF Doc. 33-7 at 13 (Request for Production No. 5); Fed. R. Civ. P. 34(a)(1) (permitting parties to request documents that are in

the responding party's "possession, custody, or control").  Lasko was also required to supplement "in a timely manner" both her disclosures and production when she learned of or obtained new medical records.  Fed. R. Civ. P. 26(e).

The medical records from Dr. Sisk, Dr. Abrams, Dr. Starz, and Dr. Nichols reflect that each of these physicians treated Lasko at UPMC.  See ECF Doc. 30-1 at 7-1.  Although, Lasko did not disclose the names of these specific physicians, she did indicate that she would be relying on medical records from "Michael Veltre, Sora Okumura, Benjamin Boss, and other physicians at University of Pittsburgh Medical Center (UPMC)" and provided the address and telephone number for UPMC.  ECF Doc. 33-2 at 2 (emphasis added).  Lasko also provided the Defendants with a means to obtain these records before discovery closed by providing both a UMPC-specific and a general HIPAA release.  See ECF Doc. 36-7; ECF Doc. 36-8.  This satisfied Lasko's first disclosure duty under Fed. R. Civ. P. 26(a)(1)(A)(i).

Lasko's second disclosure duty and duty to produce the medical records was not triggered until she came into possession of the documents.  Fed. R. Civ. P. 26(a)(1)(A)(ii); Fed. R. Civ. P. 34(a)(1).  Lasko says that she did not come into possession of those documents until after the defendants filed their motion for summary judgment and she supports this claim with an affidavit.  ECF Doc. 36 at 4; ECF Doc. 36-1 (¶4).  Accepting Lasko's timeline as true , she submitted copies of her medical records (albeit as attachments in her court filing rather than as supplements to her disclosures and discovery responses) within no greater than 30 days after she obtained them.  *Compare* ECF Doc. 28 (Motion for Summary Judgment filed on June 12, 2020), *with* ECF Doc. 30-1 (medical records filed as attachments on July 13, 2020).  Arguably, Lasko's filing did provide the Defendants with access to those medical records – even if not in a formal supplementation directed to the Defendants.

11

But was that supplementation made "in a timely manner" as required by Fed. R. Civ. P. 26(e)? No, it wasn't. Ordinarily, supplementation of disclosures and discovery responses within 30 days would be considered "in a timely manner" if made during the discovery period. *See*, *e.g.*, *EEOC v. Dolgencorp, LLC*, 196 F. Supp. 738, 795-96 (E.D. Tenn. July 7, 2016) (finding a supplemental disclosure timely when it was made within 30 days after the disclosing party received the new information). But whether a supplement is made "in a timely manner" is assessed under the particular circumstances of the case, and courts typically do not find supplementation timely when it occurs after the discovery deadline has expired. *See id.* (citing, among other cases, *Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 551-52 (6th Cir. 2010); *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003)). This is so because the disclosure and supplementation requirements are intended to permit an opposing party to conduct meaningful discovery and avoid delaying the resolution of the case. *EEOC*, 196 F. Supp. at 795 (citing *U.S. ex rel. Fry v. Guidant Corp.*, No. 3:03-842, 2009 U.S. Dist. LEXIS 88106 (M.D. Tenn. Sept. 24, 2009)). When a party delays obtaining documents that it intends to use to support its claims until well after discovery has closed and after an opponent has filed a motion for summary judgment, the opponent's ability to conduct meaningful discovery related to the delayed evidence is sunk. *Cf. Gipson*, 387 F. App'x at 554-55 (noting that discovery could be reopened in a similar situation but doing so would create an additional harm to the opponent by delaying the case). Further, a party should not be permitted to use Rule 26(e) as a backdoor to circumvent discovery deadlines set by the Federal Rules and the court's scheduling order. *Mike Hooks Dredging Co. v. Eckstein Marine Serv.*, No. 08-3945, 2011 U.S. Dist. LEXIS 84151, at *7-9 (E.D. La. Aug. 1, 2011) (citing *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73

12

F.3d 546, 571 (5th Cir. 1996) (stating that supplementation is not intended to provide an extension of discovery deadlines)).

Here, Lasko has not provided any explanation for why it took her so long to obtain the challenged UPMC records (the latest of which is dated May 2015) or explained that she requested those documents before discovery closed.  *See generally* ECF Doc. 36; ECF Doc. 42. Without such an explanation, and in light of Lasko's other discovery delays, the court is left with no other conclusion than the records were not provided to the Defendants in a timely manner and that permitting Lasko to use the records as evidence at this time would improperly reward circumvention of her discovery obligations.  *Mike Hooks Dredging Co.*, 2011 U.S. Dist. LEXIS 84151, at *7-9.  Thus, the challenged UPMC records must be excluded, unless Lasko can show that her failure to make the required disclosures was harmless or substantially justified.  Fed. R. Civ. P. 37(c)(1); *Emanuel*, 652 F. App'x at 424-25; *Dickenson*, 388 F.3d at 983.

But Lasko cannot show that her failure here was harmless or substantially justified. Lasko's sole argument – that her failure to disclose or produce the UPMC records in a timely manner was harmless when she provided HIPAA releases allowing the Defendants to obtain her medical records – is unavailing.  Providing a HIPAA release did not satisfy Lasko's obligation to timely disclose the medical records she intended to use or to produce such records in response to the Defendants' discovery requests.  See *Brooks v. Stringer*, No. 2:04-cv-120KS-MTP, 2007 U.S. Dist. LEXIS 101316, at *10-11 (S.D. Miss. Jan. 5, 2007) (That the plaintiff signed a medical records release "is irrelevant because if plaintiff wanted to use these medical record to support his claims he was obligated to produce them to defendants under Rule 26.  Defendants had no obligation to obtain the medical records.").  Further, the challenged UPMC records do not

establish facts important to the resolution of the issues in this case[2], so Lasko's need for these documents does not outweigh the surprise and prejudice to the Defendants.  *Howe*, 801 F.3d at 748.

Accordingly, because Lasko failed to timely supplement her disclosures and discovery responses with the challenged UPMC records, those records must be excluded and cannot be considered as part of the Rule 56 evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1); *Emanuel*, 652 F. App'x at 424-25; *Dickenson*, 38 F.3d at 983; *Howe*, 801 F.3d at 748.

> d.    *Restorations Physical Therapy Records, ComForcare Flowsheet, United Healthcare Letter, and Scooter Packing Slip*

The challenged records from Nicole Vogini, DPT, at Restorations Physical Therapy (ECF Doc. 30-1 at 23-26), ComForcare flowsheet (ECF Doc. 30-1 at 57-58), scooter packing slip (ECF Doc. 30-1 at 60), and United Healthcare Letter dated July 10, 2015[3] (ECF Doc. 30-1 at 72) are also subject to exclusion under Rule 37(b)(2)(A)(ii), (c)(1).  Unlike the records from UPMC, Lasko never disclosed to the Defendants that she would be relying on any medical records from Restorations Physical Therapy, Dr. Vogini, ComForcare, Luggie Scooter, Inc., or United Healthcare, as was required under Fed. R. Civ. P. 26(a)(1)(A)(i).  *See generally* ECF Doc. 33-2; ECF Doc. 33-7; ECF Doc. 33-11; ECF Doc. 33-13; ECF Doc. 33-14.  And, for the same reasons

---

[2] At most, the challenged UPMC records establish that: (1) Lasko was diagnosed with foot pain, "AVN tibial sesamoid," reflex sympathetic dystrophy of both lower extremities, hypothyroidism, hypomobile joints, knee pain, and CRPS; (2) she was prescribed hyperbaric oxygen therapy on May 14, 2015; and (3) she was also prescribed exercise, "pool," massage, assistive devise as needed, pain management, and gabapentin.  ECF Doc. 30-1 at 7-21.  Of these facts, the only particularly relevant one – that Lasko was prescribed hyperbaric oxygen therapy for treatment of her condition(s) – is established by other evidence in the record and not disputed, as discussed in Section III.B.2., below.  And consideration of those records would not change the analysis and conclusions reached in Section III, below.
[3] Lasko has also submitted other letters from United Healthcare, which the Defendants have not challenged.  *See* ECF Doc. 30-13 at 8-10 (dated February 16, 2017); ECF Doc. 30-14 (dated February 22, 2017).

14

discussed with regard to the challenged UPMC records, Lasko did not submit "in a timely manner" those documents (the latest of which was dated March 2016) to the Defendants or show that her failure to timely disclose or produce those records was harmless or substantially justified. Fed. R. Civ. P. 26(e); *Howe*, 801 F.3d at 748; *Dickenson*, 38 F.3d at 983; *see also* Section II.B.2.c., above.  Additionally, those documents do not establish facts important (or even particularly relevant) to the resolution of this case[4], so Lasko's need for these documents does not outweigh the surprise and prejudice to the Defendants.  *Howe*, 801 F.3d at 748.

Accordingly, the challenged Restoration Physical Therapy records (ECF Doc. 30-1 at 23-26), ComForcare flowsheet (ECF Doc. 30-1 at 57-58), scooter packing slip (ECF Doc. 30-1 at 60), and United Healthcare Letter dated July 10, 2015 (ECF Doc. 30-1 at 72) must be excluded and cannot be considered as part of the Rule 56 evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1); *Emanuel*, 652 F. App'x at 424-25; *Dickenson*, 38 F.3d at 983; *Howe*, 801 F.3d at 748.

e.  *Dr. Bushman's Letter*

The challenged letter from Dr. Bushman, dated June 26, 2020, did not exist until after the defendants had filed their motion for summary judgment.  ECF Doc. 30-1 at 27.  It could not possibly have been in Lasko's "possession, custody, or control" during the discovery period, and

---

[4] The challenged Restoration Physical Therapy records establish only that: (1) Lasko as referred to physical therapy to address her foot pain (which had progressed to CRPS) and ambulation difficulties; (2) her physical therapy included stretching, strength training, therapeutic exercise, cryotherapy, ultrasound, and electronic stimulation; and (3) Lasko was able to improve her ambulation, flexibility, and range of motion after four sessions of physical therapy.  ECF Doc. 30-1 at 23-26.  The ComForcare flowsheet establishes only that Lasko received home and transportation services in late July 2015.  ECF Doc. 30-1 at 57-58.  The scooter packing slip establishes only that a scooter with certain physical support features was shipped to Lasko on August 24, 2015.  ECF Doc. 30-1 at 60.  And the United Healthcare letter, dated July 2015, establishes only that hyperbaric oxygen therapy was covered under Lasko's insurance as of July 2015.  ECF Doc. 30-1 at 72.  Consideration of these records would not change the analysis and conclusions reached in Section III, below.  And any relevant fact established by these documents can be supported by other, unchallenged evidence in the record.

her duty to disclose or produce it could not have been triggered until June 26, 2020.  Fed. R. Civ. P. 26(a)(1)(A)(ii); Fed. R. Civ. P. 34.  Thus, the disclosure of this letter as an attachment to Lasko's July 13, 2020 opposition brief was made "in a timely manner."  Fed. R. Civ. P. 26(e).  Additionally, the inclusion of such a letter should not come as a surprise to the Defendants because Lasko properly disclosed that she would rely on evidence or testimony from Dr. Bushman and provided his contact information to the Defendants in June 2019.  ECF Doc. 33-2 at 2; Fed. R. Civ. P. 26(a)(1)(A)(i).  And the Defendants do not face any substantial prejudice from the post-discovery creation and disclosure of this letter because: (1) it does not say anything that isn't established by other, unchallenged evidence (see, e.g., ECF Doc. 30-1 at 32-38, 49-50, 56); and (2) it bears little relevance to the issues in this case.[5]  Howe, 801 F.3d at 748; ECF Doc. 30-1 at 27.

Accordingly, the challenged letter from Dr. Bushman (ECF Doc. 30-1 at 27) may not be excluded under Rule 37(b)(2)(A)(ii), (c)(1) and may be considered as part of the Rule 56 evidence.

### f.      Letters to and from Plaintiff

The challenged letters to and from Lasko include: (1) two letters from the Department of Health and Human Services Office for Civil Rights ("HHS-OCR"), dated June 29, 2017 (ECF Doc. 30-3 at 1, 19) and December 15, 2017 (ECF Doc. 30-3 at 17-18); (3) a February 17, 2017

---

[5] Specifically, the letter states that "In 2015 [Lasko] was diagnosed with complex regional pain syndrome.  Her symptoms from this desease [sic] include intermittent severe pain in her feet and hypersensitivity to chemicals, smells, high pitched sounds, and flashing lights. . . .  This is a formal request for disability accommodation.  She requires a quiet work environment without high pitched or unexpected sounds." ECF Doc. 30-1 at 27.  Notably, the letter does not say when Lasko was first diagnosed with or first reported sound hypersensitivity.  At most, it establishes that Lasko had sound hypersensitivity as early as June 26, 2020.  It does not indicate whether Lasko had sound hypersensitivity on or before February 2017 – when the Defendants terminated her care.  See ECF Doc. 1-1 at 3 ("Dr. Huber . . . informed [Lasko] that he was cancelling her remining treatments effective Monday, February 13, 2017.").

letter from Lasko's husband to Mobile Hyperbaric CEO Dr. Ronald Gordon and Co-President

Dr. Charles Cowap (ECF Doc. 30-3 at 2-5); (3) an April 2, 2017 letter from Lasko to Dr. Huber

(ECF Doc. 30-3 at 7-8, 13-15); (4) a February 17, 2017 letter to a "patient advocate" (ECF Doc.

30-3 at 10-13); and (5) a February 10, 2017 letter from Dr. Huber to Lasko (ECF Doc. 30-3 at

16).  Lasko says that she "absolutely" produced these letters to the Defendants because they were

attached as exhibits to her complaint and referenced by the Defendants' counsel during her

deposition.  ECF Doc. 36 at 4.  Lasko also says that the Defendants were party to those letters.

ECF Doc. 36 at 4.

     The record supports Lasko's claims that she produced the February 17, 2017 letter to

Dr. Gordon and Dr. Cowap (ECF Doc. 30-3 at 2-5); the April 2, 2017 letter to Dr. Huber (ECF

Doc. 30-3 at 7-8, 13-15); and the February 10, 2017 letter from Dr. Huber (ECF Doc. 30-3 at

16).  Each of these letters was attached to Lasko's complaint (ECF Doc. 1-1 at 7-11, 13-14), was

referenced by Defendants' counsel during Lasko's deposition (ECF Doc. 30-16 at 201-03, 228-

34), and involved the Defendants as senders or recipients (ECF Doc. 30-3 at 2-5, 7-8, 13-16).

Lasko also clearly produced the letter to "patient advocate" because *the Defendants* attached it to

their motion for summary judgment.  *Compare* ECF Doc. 30-3 at 10-13, *with* ECF Doc. 29-2 at

27-30.  Thus, Lasko met her disclosure and discovery obligations with respect to these letters and

they cannot be excluded from the Rule 56 evidence on that basis.  Fed. R. Civ. P. 26(a)(1)(A);

Fed. R. Civ. P. 37(c)(1).

     Nevertheless, Lasko has not shown that she ever disclosed or produced to the Defendants

the letters from HHS-OCR.  *See generally* ECF Doc. 36; ECF Doc. 42.  It also does not appear

that the Defendants were party to these letters.  *See* ECF Doc. 30-3 at 1, 17-19.  Lasko also has

not provided any argument that her failure to disclose those letters was harmless or substantially

justified.  *See* ECF Doc. 36; ECF Doc. 42; *Dickenson*, 388 F.3d at 983; *Howe*, 801 F.3d at 748.

So, any such argument is forfeited.  *Berkshire*, 928 F.3d at 530.  Accordingly, because Lasko has

failed to show that her failure to produce the HHS-OCR letters was harmless or substantially

justified, those letters must be excluded and cannot be considered as part of the Rule 56

evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1); *Emanuel*, 652 F.

App'x at 424-25; *Dickenson*, 38 F.3d at 983; *Howe*, 801 F.3d at 748.

> g.      *Certificates, Articles, Photos, Letters, and Educational Info*

Lasko does not dispute that she failed to timely disclose the challenged certificates,

articles, photos, letters, and educational information (ECF Doc. 30-1 at 59, 61, 63-71; ECF Doc.

30-4).  *See* ECF Doc. 36, ECF Doc. 42.  But Lasko says that he documents are admissible

because they are analogous to the Curriculum Vitae of Dr. Huber.  ECF Doc. 36 at 5.  Lasko's

assertion that these documents and photos are analogous to a physician's curriculum vitae does

not establish that her failure to disclose or produce those documents was harmless or

substantially justified.  *See Dickenson*, 388 F.3d at 983; *Howe*, 801 F.3d at 748.  And, because

none of the facts established by those documents are particularly important to resolving the

disputed issues in this case[6], Lasko's need for these documents does not outweigh the potential

prejudice to the Defendants.  *Howe*, 801 F.3d at 748; *see also* ECF Doc. 36 at 5 (noting that the

facts established by this evidence has "never been questioned").

---

[6] These challenged documents and photos establish only that: (1) Lasko was certified as a dance instructor and operated a dance studio; and (2) Lasko received medical care for her feet.  *See generally* ECF Doc. 30-1 at 59, 61, 63-71; ECF Doc. 30-4.  The potentially most relevant photo – depicting four sets of headphones and a box of ear plugs – does not establish how or why those items were used or that a physician or other care provider prescribed or recommended Lasko use these items.  *See* ECF Doc. 30-1 at 63.  And, even if these documents and photos were considered alongside the Rule 56 evidence, they would not affect the analysis and conclusions reached in Section III, below.

Accordingly, the challenged certificates, articles, photos, letters, and educational information (ECF Doc. 30-1 at 59,61, 63-71; ECF Doc. 30-4) must be excluded and cannot be considered as part of the Rule 56 evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1); *Emanuel*, 652 F. App'x at 424-25; *Dickenson*, 38 F.3d at 983; *Howe*, 801 F.3d at 748.

### h.  *Video #1*

Lasko argues that Video #1 and the unchallenged Video #2 were both part of an 18-minute video produced to the Defendants as one of the two original videos that the Defendants say they received on February 3 and 19, 2020 (before discovery closed on February 28, 2020).  ECF Doc. 36 at 2 (stating that the 18-minute video was split so it would fit on a disc filed with the court); ECF Doc. 33 at 6-7.  But the Defendants say that Video #1 should nevertheless be excluded because they "have no way of confirming this fact" when Lasko did not produce both Videos #1 and #2 to them.  ECF Doc. 39 at 4.  The Defendants' argument essentially boils down to an issue of format, but they have not cited any rules or case law indicating that a party is required to submit evidence to the court in the same format in which she produced the evidence during discovery.  *See generally* ECF Doc. 33; ECF Doc. 39.  And the text of Rule 34 suggests that no such requirement exists.  *Cf.* Fed. R. Civ. P. 34(b)(2)(E) (providing that a producing party is required to produce documents in the format they are kept or ordinarily maintained and "need not produce the same electronically stored information in more than one form").  Thus, the Defendants have not shown that Lasko failed to comply with the discovery rules with respect to Video #1.

Accordingly, Video #1 may not be excluded under Rule 37(b)(2)(A)(ii), (c)(1) and may be considered as part of the Rule 56 evidence.

i.      *Videos #4 and #5*

Because Lasko seeks to use Videos #4 and #5 as evidence supporting her claims, and not merely as impeachment evidence, she was required to disclose those videos in her initial disclosures or in a supplement to her initial disclosures. Fed. R. Civ. P. 26(a)(1)(A), (e). And because the Defendants requested Lasko's video or audio recordings, Lasko had a duty to produce and supplement her production of those videos under Rules 34 and 26(e). ECF Doc. 33-9 at 4 (¶3); Fed. R. Civ. P. 26(e); Fed. R. Civ. P. 34. Lasko does not dispute that she never produced Videos #4 and #5 to the defendants, but that she had given Video #4 to her attorney in March 2020. ECF Doc. 36; ECF Doc. 42 at 2 (citing ECF Doc. 36-2 at 2). Thus, both Videos #4 and #5 are subject to exclusion unless Lasko can show that her failure to produce Videos #4 and #5 was harmless or substantially justified. Fed. R. Civ. P. 37(c)(1); *Emanuel*, 652 F. App'x at 424-25; *Dickenson*, 388 F.3d at 983.

Lasko says that her failure to disclose or produce Videos #4 and #5 should be excused because the videos were not uncovered despite her diligent search because she did not realize she had the videos until she recalled (after the Defendants had filed their motion for summary judgment approximately four months after discovery had closed) that she stored the videos on a hard drive rather than her phone. ECF Doc. 36 at 7. Even if it is true that Lasko did not realize she had the videos until after the Defendants filed their motion for summary judgment, she does not dispute that she possessed the hard drive where they were stored while the discovery period remained open. And she has provided no explanation why a "diligent search" (as she puts it) for electronically stored recordings did not include a search of her hard drive – especially when the Defendants' request for production specifically included "computer storage device" in the definition of "documents." *See generally* ECF Doc. 36 at 7-8 (indicating that Lasko only

20

searched her phone); ECF Doc. 42; *see also* ECF Doc. 33-9 at 2 (¶5) ("The term 'document' as used herein shall mean . . . computer storage device . . ."). Also, Lasko's claim that she gave her counsel her video (around March 14, 2020) does not demonstrate that Lasko gave counsel the video *before* the close of discovery in February 2020.  *See* ECF Doc. 42 at 2; ECF Doc. 36-2 at 2.  Thus, Lasko's explanation for why she did not earlier disclose or produce the videos that were in a hard drive in her possession does not demonstrate that her failure to do so was "substantially justified."  *Dickenson*, 388 F.3d at 983; *Howe*, 801 F.3d at 748.

Lasko's claim that Videos #4 and #5 should not surprise the Defendants because they are recordings *of the Defendants* is also unavailing.  ECF Doc. 36 at 7.  The recordings are of conversations that Lasko had with Dr. Vincent Ferrini – a non-party to this case.  *See* ECF Doc. 31, Videos #4 and #5.  And Lasko has not made any argument (or provided any citations supporting such an argument) that Dr. Ferrini spoke to her on behalf of Mobile Hyperbaric or Dr. Huber.  *See generally* ECF Doc. 36; ECF Doc. 42.

Nevertheless, the court concludes that Lasko's failure to produce these recordings was harmless.  This may come as surprise to the Defendants, whose only clue as to the contents of the videos was Lasko's statement that the videos show that Dr. Ferrini "confessed that the termination was *solely* the result of a refusal to accommodate Lasko's disabilities, determined by Dr. Huber."  ECF Doc. 30 at 13 (emphasis in original).  If Lasko's statement were *accurate*, Lasko's failure to produce the videos would almost certainly not be harmless – especially when Lasko did not disclose that she would rely on testimony from Dr. Ferrini and the closure of discovery would prevent the Defendants from compelling a deposition of Dr. Ferrini to address the videos.  *Howe*, 801 F.3d at 748; ECF Doc. 33-2; ECF Doc. 33-7; ECF Doc. 33-11; ECF Doc. 33-13; ECF Doc. 33-14.  And the court would be required to exclude those videos.  Fed. R. Civ.

P. 56(c)(2); Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1); *Emanuel*, 652 F. App'x at 424-25; *Dickenson*,

38 F.3d at 983; *Howe*, 801 F.3d at 748.  But the videos don't include *any* confession.  Instead, as

discussed in Section III.B.3.d., below, Videos #4 and #5 establish at most that Dr. Ferrini told

Lasko Mobile Hyperbaric had terminated care because they were uncomfortable treating her

when the treatments caused her pain.  *See* ECF Doc. 31, Videos #4 and #5.  This fact is *favorable*

to the Defendants.  Thus, Lasko's failure to disclose Videos #4 and #5 is harmless.  *Dickenson*,

388 F.3d at 983; *Howe*, 801 F.3d at 748.

Accordingly, the court will decline to exclude Videos #4 and #5 and those videos may be

considered as part of the Rule 56 evidence.

### 3.      Summary

For the reasons discussed in Section II, above, the Defendants' motion to strike (ECF

Doc. 33) must be GRANTED in part and DENIED in part.  The court declines to *strike* any

documents at this time.[7]  Instead, the following documents will be EXCLUDED pursuant to Fed.

R. Civ. P. 37(b)(2)(A)(ii), (c)(1) and may not be considered as part of the Rule 56 evidence:

(1) the articles and manuals in (ECF Doc. 30-1 at 1-4; ECF Doc. 30-5; and ECF Doc. 30-7);

(2) the disability placard and medical infirmity certificate in (ECF Doc. 30-1 at 5-6); (3) the

UPMC medical records in (ECF Doc. 30-1 at 6-21); (4) the records from Restorations Physical

---

[7] The Court declines to *strike* any documents because exclusion under Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1) is a less draconian sanction that achieves the same result for the prejudiced party – Lasko cannot use the excluded evidence to support her claims.  And, as a practical matter, *striking* documents that were filed as part of the same attachments as documents that are not subject to Rule 37(c)(1) sanction would be an administrative headache.  The court *could* strike the *entirety* of any attachment containing both documents subject to sanctions and documents not subject to sanctions because filing multiple documents as part of the same attachment violated Local Rules, App'x B ¶15 ("[S]upporting items will each be deemed a separate component of the filing, and each component must be uploaded separately in the filing process.").  But, again, *exclusion* under Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1) achieves the same ends without being so harsh.  Finally, because Lasko may choose to appeal some portions the court's rulings concerning excluded evidence, the court would not strike a portion of the records in order to afford full appellate review.

Therapy (ECF Doc. 30-1 at 23-26); (5) the ComForcare flowsheet (ECF Doc. 30-1 at 57-58);
(6) the scooter packing slip (ECF Doc. 30-1 at 60); (7) the United Healthcare letter (ECF Doc.
30-1 at 72); (8) the certificates, articles, photos, letters, and educational information (ECF Doc.
30-1 at 59, 61, 63-71; ECF Doc. 30-4); and (9) the HHS-OCR letters (ECF Doc. 30-3 at 1, 17-
19).  The following evidence will not be excluded and shall be considered as part of the Rule 56
evidence: (1) the June 26, 2020 letter from Dr. Bushman (ECF Doc. 30-1 at 27); (2) the February
17, 2017 letter to Dr. Gordon and Dr. Cowap (ECF Doc. 30-3 at 2-5); (3) the April 2, 2017 letter
to Dr. Huber (ECF Doc. 30-3 at 7-8, 13-15); (4) the February 10, 2017 letter from Dr. Huber
(ECF Doc. 30-3 at 16); (4) the "patient advocate" letter (ECF Doc. 30-3 at 10-16); (5) Video #1;
(6) Video #4; and (7) Video #5.

### C.      Lasko's Motion to Strike

#### 1.      The Parties' Arguments

Lasko argues that the court should strike Dr. Huber's declaration (ECF Doc. 29-2 at 1-9)
and Exhibit B to that declaration (ECF Doc. 29-2 at 14-13) because Exhibit B is "facially
fraudulent."  ECF Doc. 37 at 2.  Specifically, Lasko asserts that a medical record of Lasko's
treatment by Dr. Huber on February 7, 2017 is fraudulent because it contains a "therapist
comment" by Tomas Anthony, stating:

> At air break Ann informed me that the volume was too loud and she wanted it
> lower.  I let Chris know and he turned it down to the point you could hardly hear
> any sound.  The other patient in the treatment let me know that she was unable to
> hear the movie anymore, but would like to be able to hear it.  She then told me
> that she did not want to fight with Anna and to keep it that low, even though she
> would like it to be able to hear it.

ECF Doc. 37-1 at 1 (quoting ECF Doc. 29-2 at 16).  Lasko says that this paragraph "is a
fraudulent copy-paste of an earlier report" by James Lyle at Mobile Hyperbaric's Marymount
location, which Lyle had entered on February 2, 2017.  ECF Doc. 37-1 at 2 (citing ECF

Doc. 30-17 at 3).  Lasko also contends that, because the Exhibit B included this copied paragraph and Dr. Huber's affidavit attested to the authenticity of the documents attached to it, the affidavit was submitted in bad faith and should also be stricken along with Exhibit B.  ECF Doc. 37-1 at 3.

The Defendants respond that Lasko has not presented any evidence that the medical record in Exhibit B (ECF Doc. 29-2 at 16) is "fraudulent."  ECF Doc. 41 at 3, 7.  The Defendants argue that it appears that Dr. Huber "inadvertently failed to delete the paragraph" when creating the record for Lasko's February 7, 2017 treatment, and that failure "caused [the paragraph] to be duplicated in the notes."  ECF Doc. 41 at 7.  Further, the Defendants assert that Dr. Huber accurately documented his own observations in a different (and unchallenged) part of the February 7, 2017 treatment notes.  ECF Doc. 41 at 7-8.  The Defendants also contend that Lasko has not shown that Dr. Huber's affidavit was in bad faith or that it would be inadmissible under Rule 56.  ECF Doc. 41 at 5-6.

## 2.    Analysis

Lasko has not shown that Dr. Huber's affidavit and Exhibit B are subject to exclusion. Although Lasko has not provided any supporting legal references, the court notes that a document could potentially be excluded from the Rule 56 evidence if it was "fraudulent or 'created' for purposes of litigation."[8]  *See Russo v. City of Hartford*, No. 3-97-cv-2380, 2004 U.S. Dist. LEXIS 21092, at *5 (D. Conn. Sept. 30, 2004) (denying a motion to strike documents as fraudulent).  But Lasko has not provided any evidence that anything in Exhibit B is fraudulent or was created for purposes of this litigation.  Instead, it appears that the treatment notes for

---

[8] A party seeking to exclude such evidence could also argue that it is inadmissible under Fed. R. Evid. 403 because it would cause unfair prejudice or be misleading.  But this court will not address such a theory because Lasko has not raised it.  Any such argument is forfeited for purposes of Lasko's motion to strike and the Defendants' motion for summary judgment.  *Berkshire*, 928 F.3d at 530.

February 7, 2017 – as they were regularly made and kept in the course of providing medical treatment (*see* Fed. R. Evid. 803(4), (6)) – contained a mistakenly duplicated paragraph.[9] *Compare* ECF Doc. 29-2 at 16, *with* ECF Doc. 30-17 at 1.  Moreover, Lasko herself submitted the records from Exhibit B in support of her opposition brief.  *See* ECF Doc. 30-17.  Thus, the court concludes that Exhibit B is not "fraudulent," and that Dr. Huber's affidavit was not made in bad faith on the basis of a "fraudulent" exhibit.

Accordingly, because Lasko has not shown that Dr. Huber's affidavit and Exhibit B are subject to exclusion from the Rule 56 evidence, Lasko's motion to strike (ECF Doc. 37) must be DENIED.  Nevertheless, the court notes that – to the extent Lasko's motion points out an inconsistency between Dr. Huber's affidavit and Exhibit B and other evidence in the record – the appropriate resolution of inconsistencies in the evidence under Rule 56 is to draw all reasonable inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    Motion for Summary Judgment

The Defendants' motion for summary judgment sets out six reasons they believe there is no genuine issue of material fact and they are entitled to judgment as a matter of law.  ECF Doc. 28 at 2.  First, the Defendants assert that Lasko admitted that Mobile Hyperbaric accommodated her sound hypersensitivity by turning down the volume on the TV as she requested.  ECF Doc. 28 at 2.  Second, the Defendants argue that Lasko's disagreement with Mobile Hyperbaric's and Dr. Huber's medical treatment decision does not provide a basis for a public accommodation disability discrimination claim.  ECF Doc. 28 at 2.  Third, the Defendants contend that no

---

[9] Mistakes in medical records are common enough that the U.S. Department of Health and Human Services has set out a procedure through which a patient may have inaccurate or incomplete medical records amended.  *See* 45 C.F.R. § 165.526.  But Lasko has not indicated whether she made any effort to pursue such an amendment.  *See generally* ECF Doc. 37; ECF Doc. 37-1.

evidence supports Lasko's claim that she was diagnosed with hypersensitivity to sound at any relevant time or that her alleged sound sensitivity was a qualifying disability.  ECF Doc. 28 at 2. Fourth, Lasko does not have standing to bring an ADA Title III claim for prospective relief because she has not indicated that she intends to return to Mobile Hyperbaric for treatment.  ECF Doc. 28 at 2.  Fifth, the Defendants argue that Lasko's ADA Title III claim is barred under the applicable statute of limitations.  ECF Doc. 28 at 2.  And sixth, the Defendants assert that Dr. Huber cannot be held personally liable under ADA Title III.  ECF Doc. 28 at 2.  Lasko opposes each ground.  ECF Doc. 30.  For the following reasons, the Defendants' motion for summary judgment (ECF Doc. 28) will be GRANTED.

### A.    Summary Judgment Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018).  The moving party must demonstrate "the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted).  The nonmoving party may not simply rely on her pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted); *see also Betkerur v. Aultman Hospital Ass 'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996) (The court does not have the responsibility to search the record *sua sponte* for genuine issues of fact).  A reviewing court must determine whether the evidence that the nonmoving party relies upon "presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  In evaluating the evidence presented on a summary judgment motion, courts must draw all reasonable inferences in favor of the nonmoving party.  *Id.* at 255.  Nevertheless, a court need not accept unsupported or conclusory statements as true.  *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").

### B.     Facts

The following facts are undisputed or established by the Rule 56 evidence.

#### 1.     Mobile Hyperbaric Background

In 2002, Charles Cowap, MD, and Ronald Gordon, MD, founded Mobile Hyperbaric, both as co-presidents and CEOs.  ECF Doc. 29-1 at 1.  Dr. Huber was the medical director at Mobile Hyperbaric's facility in Parma, Ohio from July 2016 through December 2018.  ECF Doc. 29-2 at 2.  Mobile Hyperbaric provides hyperbaric oxygen therapy ("HBOT"), which involves the use oxygen at greater than atmospheric pressure to increase blood oxygen levels and promote accelerated healing.  ECF Doc. 29-1 at 2-3.  The FDA has not approved HBOT for treatment of CRPS.  ECF Doc. 29-1 at 6; ECF Doc. 30-22 at 2.  Potential side effects of HBOT include ruptured eardrums or middle ear barotrauma.  ECF Doc. 29-1 at 4; *see also* ECF Doc. 30-16 at 140.

Mobile Hyperbaric provides HBOT in single-patient units ("monoplace chambers") and multi-patient units ("multiplace chambers").  ECF Doc. 29-1 at 3-4.  Because fire is a risk in oxygen-rich environments, many items and devices are not permitted in treatment chambers and mobile hyperbaric provides a TV for patients to pass time during long "dives."  ECF Doc. 29-1 at 4.  During treatment sessions, a technician sits inside the unit to observe and assist patients,

while a medical director and another technician observe the session on a closed-circuit TV monitor outside the chamber.  ECF Doc. 29-1 at 4.  The medical director is responsible for reviewing patient records, evaluating the patient conditions based on a physical examination, determining whether treatment would be medically inadvisable based on patient conditions, and supervising/documenting patient treatment.  ECF Doc. 29-1 at 5.  Medical directors also complete daily progress notes for each patient to document significant events that occur during the sessions.  ECF Doc. 29-1 at 5.

### 2.    Lasko's Pre-Mobile Hyperbaric Treatment

#### a.    Onset of CRPS and Sound Sensitivity

In 2003 or 2004, Lasko had surgery to repair a hole in her eardrum that had formed when she lived in Belarus.  ECF Doc. 30-16 at 138.

In March 2015, Lasko was diagnosed with CRPS and was prescribed a course of steroid medication that did not help.  ECF Doc. 30-22 at 2.  In addition to foot pain, Lasko's CRPS caused her to become sensitive to various stimuli, including sounds.  ECF Doc. 30-16 at 27, 30; ECF Doc. 30-21 at 2; ECF Doc. 30-22 at 1.  Exposure to sound made her feel tired quickly.  ECF Doc. 30-16 at 30.  To help muffle sounds, Lasko used foam earplugs and noise cancelling headphones, but she did not get a prescription for earplugs or noise cancelling headphones until November 2017 (and only then so she could expense the purchase with her medical account). ECF Doc. 30-16 at 32-35, 42-43, 152.  Nevertheless, Lasko could still watch "mostly educational videos" on YouTube and "calm" TV.  ECF Doc. 30-16 at 38-39.  Lasko did not seek treatment with a neurologist for her sound sensitivity because she believed that only HBOT helped her CRPS, and a neurologist that she consulted did not know what CRPS was.  ECF Doc. 30-16 at 135-36.  Lasko could also still drive and do things like go to the grocery store.  ECF Doc. 30-16

28

at 55.  Lasko stopped working and sold her dance studio due to her sound sensitivity, but no doctor had ever told her she was unable to work or discussed such a limitation with her as of February 2020.  ECF Doc. 30-16 at 54-55, 64.

Lasko's first recorded medical treatment notes reflecting her sound sensitivity are from February 19, 2016, when Dr. Bushman diagnosed Lasko with "phonophobia" after she reported "hypersensitivity to . . . sounds, TV.  No headaches."  ECF Doc. 29-3 at 31-33; ECF Doc. 30-1 at 49-50.  In December 2015 and May 2016, Dr Bushman noted that Lasko had benefitted from HBOT and improved her ability to walk.  ECF Doc. 29-1 at 93, 99-100, 104; ECF Doc. 29-3 at 25-30, 34-38; ECF Doc. 30-1 at 35, 38, 44-46, 52-53.  On January 3, 2017, Dr. Bushman noted that Lasko's CRPS was under "fair control" with medication, and that he would write a letter requesting coverage for HBOT because it had helped in the past.  ECF Doc. 29-1 at 93-96; ECF Doc. 30-1 at 38.  In the same note, Dr. Bushman also noted that Lasko had "[e]xagerated [] sensitivity to hot, cold, [and] sound" with a past diagnosis of "phonophobia."  ECF Doc. 29-1 at 93-94; ECF Doc. 30-1 at 38-39.  Dr. Bushman did not impose any medical restrictions related to sound.  ECF Doc. 30-16 at 44-45, 54.

b.  *Pre-Mobile Hyperbaric HBOT*

Lasko started HBOT at UPMC in June 2015.  ECF Doc. 30-16 at 91-93; ECF Doc. 30-22 at 2.  She attended for 30 sessions.  ECF Doc. 30-22 at 2.  Lasko stopped HBOT at UPMC because she didn't like taking tranquilizers to avoid having a panic attack during treatment in a monoplace chamber.  ECF Doc. 30-15 at 7-8; ECF Doc. 30-16 at 92-93.

After leaving UPMC, Lasko arranged for 26 HBOT sessions at Oxygen Oasis in Langhorne, Pennsylvania.  ECF Doc. 30-16 at 93-94; ECF Doc. 30-22 at 3.  Lasko left Oxygen

Oasis because she "didn't feel safe there" and believed staff were not professional.  ECF Doc. 30-16 at 95-99.

Lasko later transferred treatment for 10 HBOT sessions at University of Pennsylvania Hospital.  ECF Doc. 30-16 at 96-97, 101; ECF Doc. 30-22 at 3.  She was discharged because CRPS was not on the list of approved conditions for HBOT.  ECF Doc. 30-16 at 102.

Lasko underwent 30 HBOT sessions in Sleepy Hollow, New York.  ECF Doc. 30-16 at 104-05; ECF Doc. 30-22 at 4.  Although she improved "very much" at Sleepy Hollow, Lasko stopped treatment in Sleepy Hollow because she discovered a treatment center closer to her home (i.e., Mobile Hyperbaric in 2015-2016).  ECF Doc. 30-16 at 105-06.  Lasko also later had a billing dispute with the treatment center in Sleepy Hollow, which left her with no desire to return to her treating physician there.  ECF Doc. 30-16 at 108-110; ECF Doc. 30-22 at 2-4.

After Lasko's 2015-2016 treatment at Mobile Hyperbaric, but before she began her 2016-2017 treatment, Lasko went to Sara's Garden in Toledo, Ohio for HBOT.  ECF Doc. 30-16 at 120-21; ECF Doc. 30-22 at 6.  Lasko terminated her treatment at Sara's Garden because her health insurance did not cover it and she had a panic attack during her second session due to her claustrophobia.  ECF Doc. 30-16 at 128; ECF Doc. 30-22 at 6.

### 3. Lasko's HBOT at Mobile Hyperbaric

#### a. *Marymount Hospital – 2015-2016*

From October 2015 through February 2016, Lasko underwent approximately 60 HBOT treatment sessions at Mobile Hyperbaric's Marymount Hospital location for treatment of her Complex Regional Pain Syndrome ("CRPS").  ECF Doc. 29-1 at 5; ECF Doc. 30-16 at 113; ECF Doc. 30-22 at 4-5.  This series of treatment was completed without incident or complaint.  ECF Doc. 29-1 at 5-6; ECF Doc. 30-22 at 4-5.  During her first round of treatment at Mobile

Hyperbaric, Lasko was permitted to use specially approved head gear and staff let her play

DVDs in the treatment chamber.  ECF Doc. 30-16 at 114-15; ECF Doc. 30-22 at 7.  Lasko had to

stop her treatment at Mobile Hyperbaric due to a change in her insurance.  ECF Doc. 30-16 at

116.  After she terminated her treatment at Mobile Hyperbaric, her foot pain was improved and

she could walk a little, but she still had to go through physical therapy. ECF Doc. 30-9 at 42,

123-24; ECF Doc. 30-16 at 120; ECF Doc. 30-22 at 5.

> b.    *Marymount Hospital – January 26 to February 2, 2017*

On January 3, 2017, Dr. Bushman referred Lasko to Mobile Hyperbaric for up to

40 HBOT treatment sessions.  ECF Doc. 29-1 at 6, 89-90, 92, 103; ECF Doc. 30-1 at 35.

Dr. Bushman included with his referral letter several of his records reflecting Lasko's past

improvement from HBOT and phonophobia diagnosis.  ECF Doc. 29-1 at 93-103.

On January 9, 2017, Lorraine Doyle, MD, conducted an initial consultation and

examination of Lasko for treatment at Mobile Hyperbaric's Marymount Hospital facility.  ECF

Doc. 29-1 at 6, 108; ECF Doc. 30-20 at 1-4; *see also* ECF Doc. 30-16 at 126, 133; ECF

Doc. 30-22 at 6.  Dr. Doyle noted that Lasko's foot pain had begun in her left foot over a year

before her examination, it progressed to her right foot after her left foot became non-weight

bearing, and she was diagnosed with CRPS.  ECF Doc. 29-1 at 109; ECF Doc. 30-20 at 2.  A

bone scan in February 2015 was negative; Lasko had some improvement with hydrotherapy; she

had no improvement with anti-inflammatory medication, steroids, and narcotics; and she did not

keep further appointments with a pain management specialist who she saw in November 2015.

ECF Doc. 29-1 at 109; ECF Doc. 30-20 at 2.  Dr. Doyle noted that Lasko ha improved

ambulation after HBOT in 2016, but it did not last a year.  ECF Doc 29-1 at 109; ECF

Doc. 30-20 at 2.  Lasko was not able to tolerate the size of the chambers at a Toledo HBOT

center.  ECF Doc. 29-1 at 109; ECF Doc. 30-20 at 2.  Examination showed that Lasko was in no

distress, comfortable and cooperative, intact hearing, and an occluded right ear canal.  ECF

Doc. 29-1 at 109; ECF Doc. 30-20 at 2.  Dr. Doyle noted that the FDA had not approved HBOT

for CRPS, but that she would be scheduled for 30 HBOT sessions if her insurance approved it.

ECF Doc. 29-1 at 109-10; ECF Doc. 30-20 at 2-3.  Dr. Doyle also noted that HBOT risks

included middle ear barotrauma, which could be reduced with ear cleaning, and that Lasko

would be referred to an otolaryngologist if ear problems arose.  ECF Doc. 29-1 at 109-10; ECF

Doc. 30-20 at 2-3.  Dr. Doyle also noted that pain management or hydrotherapy could be

beneficial and that a Lasko's "multiple complaints including phonophobia also lead to a

recommendation of the care of a neurologist, a review by a psychiatrist, and/or the care of a

Physical Medicine and Rehabilitation specialist."  ECF Doc. 29-1 at 110; ECF Doc. 30-20 at 3.

From January 26 through February 3, 2017, Lasko had approximately seven HBOT

sessions at Mobile Hyperbaric's Marymount Hospital facility.  ECF Doc. 29-1 at 112-34.  Lasko

was not permitted to wear headphones because doing so was prohibited under HBOT safety

protocol.  ECF Doc. 30-16 at 39-40, 150; ECF Doc. 30-22 at 7, 12.  Notes for each session

(except February 2, 2017) stated that Lasko "was able to tolerate the hyperbaric oxygen therapy

without problems or complications."  ECF Doc. 29-1 at 118-25, 129-30, 133-34.  At each

session, Lasko signed a pre-treatment questionnaire.  See ECF Doc. 29-1 at 112-117 (no

questionnaire for treatment on January 27, 2017).  Each questionnaire indicated that Lasko rated

her pain as a 0 out of 10.  ECF Doc. 29-1 at 112-17; ECF Doc. 30-17 at 11.  The questionnaires

for January 26 and 31 and February 1, 2, and 3, 2017, Lasko each indicated that Lasko reported

having no ear pain or other problems during her previous HBOT treatment.  ECF Doc. 29-1 at

112, 114-17; see also ECF Doc. 30-16 at 141 ("I didn't have complaints about ear pain ever.").

During her January 26, 2017 session, Lasko complained that the TV was too loud, and the pre-treatment questionnaire for January 30, 2017 indicated that Lasko complained of excessive noise during her previous visit. ECF Doc. 29-1 at 112-13; ECF Doc. 30-17 at 11. On January 30, 2017, Dr. Doyle talked with Lasko in front of the administrator's desk about the TV noise and Dr. Doyle told Lasko to treat her sound sensitivity before returning for HBOT. ECF Doc. 30-16 at 144, 147; ECF Doc. 30-21 at 4. The technician during one of these earlier sessions set the volume of the TV lower. ECF Doc. 30-22 at 8; *see also* ECF Doc. 30-16 at 153 (stating that staff accommodated her requests at "one or two" treatment sessions). On January 31, 2017, Dr. Doyle saw Lasko for a follow-up examination. ECF Doc. 29-1 at 126-28. Dr. Doyle noted that Lasko "complain[ed] of sensitivity to many sounds (hyperacusia)" and had occluded right ear canals. ECF Doc. 29-1 at 126-27. Dr. Doyle also stated:

> No objective evidence of improvement is seen at this point in her treatment. She has multiple complaints about noise in the chamber; she has been offered the opportunity to try other chambers but chooses not to do so. Once again, it has been suggested that she see a neurologist or ENT physician to help with her hyperacusis, possibly undergoing cognitive behavioral therapy, but she "wants the foot to be better first." She will continue her HBOT, hoping to improve.

ECF Doc. 29-1 at 127.

On February 2, 2017, Lasko again complained that volume on the TV was too loud, and the technician set the volume to a level that neither the technician nor the other patient (who had difficulty hearing) could hear, but Lasko could. ECF Doc. 29-1 at 116; ECF Doc. 30-16 at 167-68, 171-74; ECF Doc. 30-22 at 8. Lasko complained to Dr. Doyle, who (with a raised voice) told her to see a specialist for her sound sensitivity. ECF Doc. 30-16 at 159-60; ECF Doc. 30-22 at 8. The notes for Lasko's February 2, 2017 HBOT session stated:

> Therapist Comments:
> Therapist:  Lyle, James
> Notes:  Patient is cleared for HBOT.

At air break Ann informed me that the volume was too loud and she wanted it lower.  I let Chris know and he turned it down to the point you could hardly hear any sound.  The other patient in the treatment let me know that she was unable to hear the movie anymore, but would like to be able to hear it.  She then told me that she did not want to fight with Anna and to keep it that low, even though she would like it to be able to hear it.

Physician Comments:

Notes:  Patient cleared for HBOT.  I was present to supervise therapy.  The patient will continue treatment regimen daily.  She continues to complain about noise.  I have explained that we have lowered the volume of the TV as much as possible but that the other patients deserve to hear.  I have strongly advised her that she seek therapy from a neurologist or ENT for hyperacusia.

ECF Doc. 29-1 at 131.

On February 2 or 3, 2017, Dr. Doyle told Dr. Cowap that Lasko had complained about pain during treatment several times, that Lasko believed it was due to the volume of the TV in the treatment chamber, and that Lasko had not complained about the compressor motors, which Dr. Doyle said were "significantly louder." ECF Doc. 29-1 at 7.  Dr. Doyle told Dr. Cowap that she found no other cause for Lasko's pain, but that Lasko continued to complain about hypersensitivity to sound after the TV volume was lowered significantly. ECF Doc. 29-1 at 8.  Dr. Doyle told Dr. Cowap that Lasko had been belligerent and argumentative on multiple occasions. ECF Doc. 29-1 at 8.  Lasko told Dr. Cowap that she wanted to move her treatment to Mobile Hyperbaric's Parma, Ohio facility, and her insurance approved the change in location. ECF Doc. 29-1 at 8; ECF Doc. 30-22 at 9.

c.    Parma Facility – February 7-9, 2017

On February 7, 2017, Lasko began treatment at Mobile Hyperbaric's Parma facility. ECF Doc. 29-1 at 8; ECF Doc. 29-2 at 2; ECF Doc. 30-22 at 9.  Lasko underwent three HBOT treatment sessions under Dr. Huber's supervision on February 7, 8, and 9, 2017. ECF Doc. 29-1 at 8; ECF Doc. 29-2 at 2.  On February 7 and 8, 2017, Lasko signed questionnaires indicating

34

that she did not have any ear pain or other problems during her previous HBOT treatment and that she had 0 out of 10 pain.  ECF Doc. 29-1 at 135-36; ECF Doc. 29-2 at 14-15; *see also* ECF Doc. 30-16 at 141 ("I didn't have complaints about ear pain ever.").  The technician and physician notes for Lasko's February 7, 2017, HBOT session included the same text entered in James Lyle's technician notes and Dr. Doyle's physician notes on February 2, 2017.  *Compare* ECF Doc. 29-1 at 137; ECF Doc. 29-2 at 16; ECF Doc. 30-17 at 1, *with* ECF Doc. 29-1 at 131; ECF Doc. 30-17 at 3.

During Lasko's first treatment session on February 7, 2017,  she asked the technician (Tom Anthony) to lower the TV volume.  ECF Doc. 30-22 at 10.  Anthony initially lowered the volume but turned it back on at the end of the treatment session.  ECF Doc. 30-16 at 180, 184-85; ECF Doc. 30-22 at 10.  When Lasko told Anthony to lower it again, he told her that it would be louder the next time and that she should not come any more if it bothered her.  ECF Doc. 30-16 at 184; ECF Doc. 30-22 at 10.  During the HBOT session, Lasko wore earplugs, and both Anthony and monitoring technician told Dr. Huber that Lasko was unable to hear the chamber technician's questions or instructions.  ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 4; ECF Doc. 30-16 at 179; ECF Doc. 31, Video #2 (6:14-6:47).

After her February 7, 2017, treatment session, Lasko told a technician and Dr. Huber about Anthony turning the volume back on and yelling at her.  ECF Doc. 29-2 at 4, 18; ECF Doc. 30-16 at 178; ECF Doc. 30-22 at 10-12; ECF Doc. 31, Video #1 (0:39-0:45, 1:57-2:00, 6:49-7:03); ECF Doc. 31, Video #2 (0:20-1:15, 5:48-6:15).  Lasko said that the TV volume level exacerbated her pain syndrome.  ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 18; ECF Doc. 31, Video #2 (0:20-1:15); *but see* ECF Doc. 30-16 at 178 ("I didn't say that particular dive was exacerbated pain.  I only complained about the technician who was with me in the chamber.").

The technician assured Lasko that she would not be scheduled with Anthony again, and (at Lasko's request) helped her schedule an appointment during a time in which the fewest number of other patients (i.e., one other patient) would be in the chamber with her.  ECF Doc. 31, Video #1 (2:00-2:19, 4:45-5:50).  Lasko also asked the technician if she could bring DVDs to watch, but the technician said the DVD player was broken.  ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 18; ECF Doc. 31, Video #1 (3:57-4:42).  Dr. Huber noted that Anthony had told him the volume was low and that Lasko did not complain about it.  ECF Doc. 31, Video #2 (4:36-4:46). Dr. Huber also noted that this had happened at other locations and asked Lasko why she was "choosing to be difficult about this."  ECF Doc. 31, Video #2 (2:13-2:25, 6:47-7:12).

Lasko told the technician and Dr. Huber that she should be allowed to choose the volume of the TV when she was in the treatment chamber by herself.  ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 18; ECF Doc. 29-2 at 4; ECF Doc. 31, Video #1 (6:23-6:43); ECF Doc. 31, Video #2 (2:34-3:14, 3:55-46, 5:11-5:38).  Dr. Huber recommended a monoplace chamber, but Lasko said she could not use a monoplace chamber because she was claustrophobic.  ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 18; ECF Doc. 31, Video #2 (2:13-34, 6:56-718).  The technician and Dr. Huber noted that there would always be other patients in the treatment chamber with Lasko and that they would try to accommodate her, but not at the expense of other patients.  ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 4, 18; ECF Doc. 30-17 at 5; ECF Doc. 31, Video #1 (4:13-4:42); ECF Doc. 31, Video #2 (2:34-3:14, 3:55-4:36, 5:11-5:38).  Dr. Huber agreed that they would turn off the volume if she was alone in the chamber, and asked Lasko what they should do when other patients were in the chamber with her.  ECF Doc. 31, Video #2 (7:18-7:27, 8:35-8:55).  Lasko said that she would compromise and "find the balance between other patients and the volume." ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 18; ECF Doc. 30-16 at 182-83; ECF Doc. 30-17 at 5;

ECF Doc. 31, Video #2 (7:27-8:35, 8:55-9:19).  Lasko did not request that no other patients be permitted in the treatment session with her.  ECF Doc. 30-16 at 180; ECF Doc. 30-22 at 12.

Lasko's February 8, 2017, HBOT session went well, without any complications or complaints.  ECF Doc. 29-1 at 140; ECF Doc. 29-2 at 4, 19; ECF Doc. 30-17 at 6; ECF Doc. 30-22 at 13.  The chamber technician put a quiet documentary with a low volume on the TV.  ECF Doc. 30-22 at 13.  After the session, Lasko told Dr. Huber that "everything went great."  ECF Doc. 30-22 at 13.

At Lasko's treatment session on February 9, 2017, the treatment technician had a comedy show on the TV at a loud volume.  ECF Doc. 30-16 at 190-91, 194; ECF Doc. 30-22 at 14. Here, Lasko's story of events is inconsistent, she either: (1) told the technician that she was in pain due to the volume and asked it to be turned down (*see* ECF Doc. 30-16 at 190-92); or (2) she asked the technician to allow her to choose a channel for 50% of the treatment session as a matter of fairness (*see* ECF Doc. 31, Video #3 (1:35-1:41, 3:36-4:01, 4:23-4:43), Video #4 (2:00-3:25, 4:45-4:55)).  Either way, the technician ignored her request.  ECF Doc. 30-16 at 190-92; ECF Doc. 31, Video #3 (1:35-1:41, 3:36-4:01, 4:23-4:43), Video #4 (2:00-3:25, 4:45-4:55).

At the end of her session, Lasko left without having her vitals checked even though the technician on February 7, 2017, had told Lasko that they checked vitals after treatment.  ECF Doc. 30-16 at 200-01; ECF Doc. 30-22 at 14; *see also* ECF Doc. 31, Video #1 (0:30-0:39). Although Dr. Huber noted that Lasko "was able to tolerate the hyperbaric oxygen therapy without problems or complications," he also noted that Lasko had: (1) again complained and argued with technicians about the TV; (2) repeatedly tried to cover her head and oxygen hood with a blanket despite technician instructions that this was against safety protocol; and

(3) created an unsafe environment for the technicians and other patients.  ECF Doc. 29-1 at 144, 142; ECF Doc. 29-2 at 5, 21, 23; ECF Doc. 30-17 at 8, 10.

*d.      Termination of Treatment*

After Lasko's HBOT session on February 9, 2017, Dr. Huber called Dr. Cowap and Mobile Hyperbaric administrator Gay Marker.  ECF Doc. 29-1 at 8, 144; ECF Doc. 29-2 at 6, 23. Dr. Huber told Dr. Cowap and Marker that Lasko had complained about the volume of the TV in the HBOT chamber, argued with staff, tried to cover her head with a blanket in violation of safety protocol, and left the facility without having post-treatment vitals taken in violation of safety protocol.  ECF Doc. 29-1 at 8-9; ECF Doc. 29-2 at 6.  Dr. Cowap and Dr. Huber determined that, in light of the circumstances (including the failure to last a year of Lasko's improvements from her 2015-2016 treatments), they had an "ethical obligation" to discontinue Lasko's HBOT treatments to protect her safety.  ECF Doc. 29-1 at 9, 144; ECF Doc. 29-2 at 6, 23.  Dr. Cowap and Marker told Dr. Huber that they would draft a letter to Lasko.  ECF Doc. 29-1 at 144; ECF Doc. 29-2 at 6, 23.

On February 10, 2017, Dr. Huber sent Lasko a letter (drafted by Dr. Cowap and Marker), stating that Mobile Hyperbaric was cancelling her treatments effective February 13, 2017.  ECF Doc. 29-1 at 145; ECF Doc. 29-2 at 6-7, 24, 45; ECF Doc. 30-3 at 16.  Dr. Huber explained that Mobile Hyperbaric could not accommodate Lasko's request to schedule all of her treatment sessions alone in the multiplace chamber because Mobile Hyperbaric needed to be able to provide HBOT to all patients who were scheduled in the multiplace chamber.  ECF Doc. 29-1 at 145; ECF Doc. 29-2 at 24, 45; ECF Doc. 30-3 at 16.  Dr. Huber also offered to help Lasko locate a different multiplace chamber facility that might be able to accommodate her request.  ECF Doc. 29-1 at 145; ECF Doc. 29-2 at 24, 45; ECF Doc. 30-3 at 16.

38

On February 13, 2017, Dr. Huber called Lasko and left her a message informing her that her treatments were cancelled. ECF Doc. 30-22 at 14; ECF Doc. 31, Video #3 (0:39-0:46). Lasko called Dr. Huber and asked him why her treatments were being cancelled. ECF Doc. 30-16 at 203; ECF Doc. 31, Video #3 (0:54-0:55). Dr. Huber explained that Mobile Hyperbaric could not meet her demands and requests, and that she had complained to one of the technicians about the volume of the TV during her treatment session on February 9, 2017. Lasko said that she did *not* complain about the volume of the TV but had only asked the technician to change the channel because she wanted to select a different channel. ECF Doc. 31, Video #3 (1:35-1:41, 3:36-3:41, 3:47-3:51, 3:53-4:01, 4:23-4:27, 4:29-4:43). Dr. Huber told Lasko that her complaints were impacting patient care and that Mobile Hyperbaric did not want to continue treating her if she was in pain. ECF Doc. 31, Video #3 (1:41-1:49, 2:16-2:21, 2:27-2:39).

After her conversation with Dr. Huber, Lasko called Dr. Ferrini and recorded the conversation. ECF Doc. 31, Video #4; *see also* ECF Doc. 30-16 at 206-07; ECF Doc. 30-22 at 15. During that conversation, Lasko told Dr. Ferrini that she was surprised her treatment was terminated because she "absolutely didn't make any request" and had only asked to be able to choose what channel was on the TV 50% of the time as a matter of fairness. ECF Doc. 31, Video #4 (2:00-3:25, 4:45-4:55). Lasko also noted that she had brought earplugs with her for treatment. ECF Doc. 31, Video #4 (1:20-1:24). Dr. Ferrini said that he didn't know why her treatment was terminated and would look into it further. ECF Doc. 31, Video #4; *see also* ECF Doc. 30-22 at 15. The next day, Lasko again called Dr. Ferrini, who said that her treatment was terminated because Dr. Huber and upper management felt that they could not meet her needs and did not feel comfortable treating her when she was in a lot of pain during treatment. ECF Doc. 31, Video #5; *see also* ECF Doc. 30-22 at 15.

On February 17, 2017, William Lasko (Lasko's husband) sent Dr. Cowap and Robert Gordon, MD, a letter accusing Dr. Huber of having discriminated against Lasko on the basis of her national origin.  ECF Doc. 29-1 at 146-49; ECF Doc. 30-3 at 2-5.  After receiving the letter, Dr. Cowap set up a phone call with Lasko and her husband.  ECF Doc. 29-1 at 10; ECF Doc. 30-16 at 205-06 (stating that she had the phone call with Dr. Cowap but did not remember the details of what was discussed).  During the phone call, Dr. Cowap told Lasko that he felt it was not safe or ethical for Mobile Hyperbaric to continue treating her when she was having ear pain during treatments and the physicians at Mobile Hyperbaric did not have any confidence that HBOT benefitted her.  ECF Doc. 29-1 at 10.  Lasko told Dr. Cowap that she was able to tolerate treatments, and Dr. Cowap said that she could continue treatment at Mobile Hyperbaric without any assurance of benefit if she felt that she could tolerate the pain of the noise in the chamber.  ECF Doc. 29-1 at 10.  Lasko indicated that she had already arranged for treatment in Washington state.  ECF Doc. 29-1 at 10.

On April 2, 2017, Lasko sent another letter (addressed to Dr. Huber), setting out additional complaints about her treatment at Mobile Hyperbaric and accusing Dr. Huber and staff of abuse and discrimination.  ECF Doc. 29-1 at 10, 154-55; ECF Doc. 29-2 at 7, 25-26, 30-32, 48-49; ECF Doc. 30-3 at 7-8, 13-15.

### 4.    Lasko's Treatment after Mobile Hyperbaric Termination

#### a.    HBOT at Other Institutions

After Lasko was terminated from Mobile Hyperbaric, she arranged for treatment at an HBOT facility in Spokane, Washington.  ECF Doc. 30-16 at 204, 209; ECF Doc. 30-22 at 16.  On February 21, 2017, Lasko notified the HBOT facility in Spokane that she was also approved for treatment at a facility in Florida, but she decided to pick the Spokane facility instead.  ECF

Doc. 30-16 at 211.  On February 27, 2017, Karen Stanek, MD, wrote a prescription for 30 HBOT sessions with "quiet protocol."  ECF Doc. 30-13 at 6.  The facility in Spokane did not turn on the TV during her treatment.  ECF Doc. 30-16 at 214.

After having an issue with the police in Spokane, Lasko transferred her treatment to Brevard Hyperbaric Oxygen Center in Melbourne, Florida.  ECF Doc. 30-16 at 74, 213, 218-20; ECF Doc. 30-22 at 16.  After 20 HBOT sessions between March and May 2017, Lasko's CRPS went into remission and she was able to walk without any pain.  ECF Doc. 30-16 at 44-45, 54; ECF Doc. 30-22 at 16.  In her July 9, 2020 affidavit, Lasko stated that she remained able to walk from May 2017 forward.  ECF Doc. 30-22 at 16.

### b.      Other Medical Treatment

On November 10, 2017, Dr. Bushman wrote Lasko – for the first time – a prescription for earplugs based on her phonophobia.  ECF Doc. 30-1 at 34.  On February 18, 2018, Lasko told Dr. Bushman that she wore earplugs, had worse sensory problems with high pitched noises (such as "clinking"), and had a problem with "[n]oisy TV."  ECF Doc. 30-1 at 32.  On March 6, 2018, Dr. Bushman wrote Lasko a prescription for a "noise-generating app."  ECF Doc. 30-1 at 34.  On June 26, 2020, Dr. Bushman wrote a letter, imposing – for the first time in any record documents – restrictions related to Lasko's sound intolerance.  ECF Doc. 30-1 at 26 ("quiet work environment without high pitched or unexpected sounds"); *see also* ECF Doc. 30-16 at 44-45 (Lasko stating that Dr. Bushman had not imposed *any* sound-related restrictions as of February 2020).

On April 11, 2018, Benjamin Boss, Au.D., evaluated Lasko for her complaints about decreased sound tolerance.  ECF Doc. 30-1 at 56; *see also* ECF Doc. 30-16 at 36, 83-84, 88-89.  Dr. Boss determined that Lasko's hearing was normal in both ears, that her sound intolerance

41

was not related to tinnitus, and that her "loudness discomfort levels" indicated abnormal sound

tolerance.  ECF Doc. 30-1 at 56.  Dr. Boss recommended that Lasko *avoid* silence, *discontinue*

using noise cancelling headphones, and engage in environmental sound enrichment.  ECF

Doc. 30-1 at 56 (emphasis added).

### 5.    Complaint and Removal

On February 12, 2019, Lasko filed a two-count complaint in the Cuyahoga County Court

of Common Pleas.  ECF Doc. 1 at 1; ECF Doc. 1-1.  Count I seeks damages and injunctive relief,

pursuant to Ohio Rev. Code § 4112.99, because the Defendants "refused to permit the full

enjoyment of Mobile[ H]yperbaric['s] chamber" in violation of Ohio Rev. Code § 4112.02(G).

ECF Doc. 1-1 at 4.  Count II alleges that the Defendants "failed to reasonably accommodate

Lasko's disability in violation of 42 U.S.C. § 12182(b)(1)(A)(i)" (Title III of the Americans with

Disabilities Act of 1990, Pub. L. 101-336 § 302 ("ADA Title III")).[10]  ECF Doc. 1-1 at 4-5.  As

relief, Lasko asks for: (1) an injunction prohibiting the Defendants from discriminating against

her and requiring them to amend their policies and procedures to accommodate patients with

audial hypersensitivity; and (2) order the Defendants to pay "a. compensatory damages,

b. incidental and consequential damages, c. expectancy damages, d. punitive damages,

e. reasonable attorneys' fees and costs . . . ."  ECF Doc. 1-1 at 5.

The factual allegations in Lasko's complaints (when read in light of the record evidence)

set out three distinct occasions on which Lasko believes the Defendants failed to make

reasonable accommodations in violation of Ohio Rev. Code § 4112.02(G) and Title III of the

---

[10] Count II also includes what appears to be prayer for relief for a breach of contract claim for repairs to a "premises" and the Defendants' failure to return advanced payment for work on that premises.  ECF Doc. 1-1 at 5 (¶35).  This breach of contract claim does not appear in any way related to the arguments and allegations in this case, but instead appears to result from a lapse in proof-reading by counsel.  ECF Doc. 1-1 at 5.  At any rate, no evidence in the record establishes that Lasko had contracted with Mobile Hyperbaric or Dr. Huber to work on any "premises" that Lasko later had to repair.

ADA: (1) when a technician allegedly refused to turn down the TV volume during her February 7, 2017 treatment session; (2) when a technician allegedly refused to turn down the TV volume during her February 9, 2017 treatment session; and (3) when Dr Huber allegedly refused her requests for accommodation and terminated her remaining treatment sessions effective February 13, 2017.[11]  ECF Doc. 1-1 at 3 (¶¶16-20); *see also* ECF Doc. 29-1 at 8, 135-36, 145; ECF Doc. 29-2 at 2, 6-7, 24, 25; ECF Doc. 30-3 at 16; ECF Doc. 30-16 at 141, 180, 184-85, 190-92, 203; ECF Doc. 30-22 at 9-10, 14; ECF Doc. 31, Videos #1-#5.

On March 12, 2019, the Defendants filed a notice of removal, invoking this court's diversity jurisdiction under 28 U.S.C. § 1332(a) because: (1) Lasko is a citizen of Pennsylvania; (2) the Defendants are citizens of Ohio; and (3) the amount in controversy exceeds $75,000. ECF Doc. 1 at 1-2.

### C.    Procedural Challenges[12]

The Defendants raise two procedural challenges to Lasko's ADA Title III claims, which they believe entitle them to judgment as a matter of law.  ECF Doc. 29 at 24-25.  First, the Defendants argue that Lasko has no standing to bring an ADA Title III claim because: (1) Title III permits plaintiffs to seek only prospective injunctive relief; and (2) Lasko has not provided *any* evidence that she intends to return to Mobile Hyperbaric for treatment or faces the threat of future discrimination, especially when her CRPS is in remission.  ECF Doc. 29 at 24.  Second,

---

[11] Although Lasko's opposition brief and evidentiary submissions also appear to allege discrimination occurred during her treatment at Mobile Hyperbaric's Marymount facility under Dr. Doyle, her complaint never mentioned her treatment at that facility or under Dr. Doyle's supervision and, therefore, asserted no claim arising from that care.  ECF Doc. 1-1 at 2-3 (¶¶12-20); *cf. Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ("a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory" to survive a motion to dismiss); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face.").

[12] For ease of analysis, the court addresses the issues in the Defendants' motion for summary judgment in an order different from that used in the parties' briefing.

the Defendants assert that Lasko's Title II claim is barred under the two-year statute of limitations because she was discharged as a patient on February 9, 2017 but did not file her complaint until February 12, 2019.  ECF Doc. 29 at 25.

Lasko responds that she has standing because, although she completed her treatments and her CRPS is in remission, she would like to be able to return to Mobile Hyperbaric (with accommodation) if her condition were to recur.  ECF Doc. 30 at 18-19.  Lasko argues that her claim is not barred under the statute of limitations because she was scheduled for treatment at Mobile Hyperbaric on February 13, 2017 and was not informed that her treatment had been terminated until the Defendants' letter was received at a later date).

In their reply brief, the Defendants argue that Lasko's conclusory assertion in her opposition brief – that she would "gladly return" to Mobile Hyperbaric – is insufficient to establish standing under ADA Title III, especially when her complaint did not indicate that she intended to return to Mobile Hyperbaric for future treatments.  ECF Doc. 34 at 10-11.  The Defendants assert that Lasko's claim is time-barred notwithstanding the February 13, 2017 treatment cancellation because the discrete discriminatory conduct must have occurred, if at all, during her treatment between January 26 and February 9, 2017.  ECF Doc. 34 at 12-13.

### 1.     Analysis

Article III standing requires a plaintiff to show, among other things, an "injury in fact" that is both: (1) "concrete and particularized;" and (2) "actual or imminent, not conjectural or hypothetical."  *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "Title III [of the ADA] does not provide for damages" for a private plaintiff, but only allows private plaintiffs to seek prospective injunctive relief.  *Johnson v. Aspirus Corp.*, No. 20-1015, 2020 U.S. App. LEXIS 21789, at *4

(6th Cir. Jul. 13, 2020) (citing *Smith v. Wal-Mart Stores, Inc.*, 176 F.3d 286, 294 (6th Cir. 1999);

*Southwell v. Summit View of Farragut, LLC*, 494 F. App'x 508, 512 (6th Cir. 2012)); *see*

*also* 42 U.S.C. § 12188(a)(2).  When a private plaintiff brings a claim under Title III of the

ADA, she must "'demonstrate[] the requisite threat of future injury [by establishing:] (1) a

plausible intent to return to the noncompliant accommodation; or (2) that [she] would return, but

is deterred from visiting the noncompliant accommodation because of the alleged accessibility

barriers.'"  *Mosley*, 942 F.3d at 757 (citing *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x

576, 580 (6th Cir. 2014)); *see also O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past

exposure to illegal conduct does not in itself show a present case or controversy regarding

injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").  In

determining whether a claimant's purported intent and desire to return to the public

accommodation is plausible, courts look to the particular facts of the case.  *Mosley*, 942 F.3d at

757-58, 762 (looking to the claimant's history, number of times visiting the place, reasons why

the plaintiff went to the place, and existing plans).

There is no record evidence which shows Lasko has a plausible intent to return to Mobile

Hyperbaric or that she would return but for Mobile Hyperbaric's alleged noncompliance with

Title III of the ADA.  *Mosley*, 942 F.3d at 756-58.  Although Lasko states that she would like to

return to Mobile Hyperbaric *if her CRPS relapses*, she has not shown that she has any present

condition that requires her to seek hyperbaric oxygen therapy or any existing plans to do so.  *See*

*generally* ECF Doc. 30 at 15-16; *see also* ECF Doc. 30-16 45-46, 51 (establishing that Lasko's

CRPS has been in remission since May 2017); ECF Doc. 30-22 at 16.  Lasko also has not alleged

or pointed to any evidence indicating that her CRPS is likely to relapse or that, if it does, her

providers are likely to refer her for hyperbaric oxygen therapy or that her healthcare insurance

would approve such off-label treatment again. *See generally* ECF Doc. 30 at 15-16. Thus, Lasko lacks Article III standing for her Title III claim because she has not shown an injunction under Title III of the ADA would address anything more than a hypothetical future injury. *Mosley*, 942 F.3d at 756-58.

Accordingly, because Lasko lacks standing for her claim under Title III of the ADA, the Defendants' motion for summary judgment (ECF Doc. 28) must be GRANTED with respect to that claim. And, because the Defendants' statute-of-limitations argument[13] challenges only Lasko's ADA claim (and not whether the time to bring a claim under Ohio Rev. Code § 4112.02(G) expired), the court need not address that the Defendants' statute-of-limitations argument in light of the conclusion that Lasko lacks standing under Title III of the ADA. *See* ECF Doc. 29 at 20.

### D.     Merits Challenges

#### 1.     Public Accommodation Discrimination Standard

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Ohio's similar unlawful discrimination statute prohibits: "any proprietor or any employee, keeper, or manager of a place of public

---

[13] Without analyzing the details of whether Lasko's claim that the Defendants discriminated against her on February 9, 2017 or at earlier appointments is timely under a continuing injury theory, the court notes that Lasko's claim that the Defendants discriminated against her when they refused to accommodate her sound hypersensitivity and terminated her treatments on February 13, 2017, would be timely under the two-year statute of limitations. *See Deck v. City of Toledo*, 56 F. Supp. 2d 886, 890 (N.D. Ohio Jun. 29, 1999) (noting that a two-year statute of limitations applies to claims under Title III of the ADA). This is so because – although Lasko might have had advanced notice that the Defendants intended not to provide a requested accommodation on February 13, 2017 – the actual denial of the accommodation and termination of that appointment occurred on February 13, 2017. *Cf. id.* at 892 (noting that the limitations period begins to run *at the time the discriminatory act occurred*).

accommodation to deny any person, except for reasons applicable alike to all persons regardless of . . . disability . . . , the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation." Ohio Rev. Code § 4112.02(G).  Because the two statutes are nearly identical, the Ohio Supreme Court has directed Ohio courts to look to federal ADA law when interpreting the Ohio disability discrimination law.  *See Columbus Civ. Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573 ("The federal Americans with Disabilities Act ('ADA') is similar to the Ohio handicap discrimination law.  We can look to regulations and cases interpreting the Federal Act for guidance in our interpretation of Ohio law.").

To survive summary judgment on a claim under Title III of the ADA, a plaintiff must point to record evidence from which a reasonable juror could conclude that: (1) she has a qualifying disability; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against her on the basis of her disability. *Jones v. Natural Essentials, Inc.*, No. 5:16-cv-93, 2017 U.S. Dist. LEXIS 44342, at *15 (N.D. Ohio Mar. 27, 2017); *Access Ctr. for Indep. Living v. W.P. Glimcher, Inc.*, No. 3:15-cv-444, 2018 U.S. Dist. LEXIS 96734, at *8 (S.D. Ohio Jun. 8, 2018).  A claim under the Ohio statute differs from the ADA claim only as to the second element, which is satisfied when the defendant is a "proprietor or any employee, keeper, or manager of a place of public accommodation." Ohio Rev. Code § 4112.02(G).  A place of public accommodation includes the professional office of a health care provider.  *Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1163 (E.D. Mich. Feb. 8, 1994) (citing 42 U.S.C. § 12181(7)(F)).  Discrimination on the basis of disability includes:

> "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations*."  [42 U.S.C.] § 12182(b)(2)(A)(ii).

47

*PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682 (2001) (emphasis in original); *see also Johnson v. Kroger Co.*, No. 2:18-cv-1240, 2020 U.S. Dist. LEXIS 126174, at *39 (S.D. Ohio Jul. 17, 2020) ("Full enjoyment" under Ohio Rev. Code § 4112.02(G) is admission to a place of public accommodation and access to its services and products in the same manner as other customers.).

> ### 2. TV Volume Accommodation
>
> #### a. Parties' Arguments

The Defendants argue that they are entitled to judgment as a matter of law because there is no genuine dispute of material fact over whether the Defendants failed or refused to make reasonable accommodations by turning down the volume of the TV in Lasko's treatment chamber. ECF Doc. 29 at 20-21. Specifically, the Defendants assert that no reasonable juror could conclude that they failed to make such an accommodation when Lasko "specifically admitted at her deposition that the volume on the TV in the hyperbaric chamber was, in fact, turned down at her request." ECF Doc. 29 at 17, 21 (citing ECF Doc. 30-16 at 171-72).

Lasko responds that her sworn affidavit and deposition testimony establish a genuine issue of material fact as to whether the Defendants refused to make reasonable accommodations by turning down the TV. ECF Doc. 30 at 11-12. Specifically, Lasko says that the technician at her February 7, 2017 session turned the volume back up after initially lowering it and told her that it would be louder next time. ECF Doc. 30 at 11. Her February 8, 2017 session did not require the technician to lower the volume because it was already on a "soothing and non-bothersome" travel channel. ECF Doc. 30 at 12. And the volume was never lowered at her February 9, 2017 session. ECF Doc. 30 at 12. Further, Lasko asserts that turning down the TV was a reasonable request because the TV served no medical function. ECF Doc. 30 at 12.

In their reply brief, the Defendants argue that Lasko had admitted they accommodated her request to turn down the TV during her treatment session when she said at deposition:

> If the volume was turned down, then it was still to the point – to the level where it was still loud to me.  You know, you can turn down the volume ten bars or you can turn down the volume one bar, so. * * * It was never – I have to correct.  It was never turned down to the level like it used to be when I had treatments year before.  If it was turned down, it was turned down to a level that it was still hurting me.

ECF Doc. 34 at 6 (quoting ECF Doc. 30-16 at 171-72).  The Defendants also assert that Lasko's treatment notes for her treatment sessions between January 26 and February 9, 2017, establish that Mobile Hyperbaric staff turned down the TV volume to the point that it was "barely discernable" and resulted in complaints from other patients.  ECF Doc. 34 at 7 (citing ECF Doc. 29-1 at 7-8 (¶¶18-21)).

> ### b.  Analysis

Contrary to the Defendants' position, the evidence in the record viewed in a light most favorable to Lasko, does not establish that Lasko admitted the Defendants accommodated her requests related to the TV volume by lowering it during her treatment at Mobile Hyperbaric's Parma facility under Dr. Huber's supervision.  *Compare* ECF Doc. 29 at 12, 21, *with* ECF Doc. 30-16 at 171-72, 190-91.  Read in context, the comments that the Defendants cite from pages 171–72 of Lasko's deposition were not made in reference to *any treatment session at the Parma facility*.  *See* ECF Doc. 30-16 at 171-72.  Instead, it is clear from the context that Lasko was describing what happened during a treatment session on February 2, 2017, at the *Marymount* facility under Dr. Doyle's supervision.  *See* ECF Doc. 30-16 at 170-72.  To the extent the Defendants seek to attack claims related to *that* treatment, they have attacked a strawman because Lasko's complaint did not allege any claims stemming from her treatment under Dr. Doyle's supervision.  *See* ECF Doc. 1-1 at 2-3 (¶¶12-20) (giving notice only of claims

49

arising out of her treatment under Dr. Huber's supervision). Moreover, even accepting the claim that Lasko described her treatment under Dr. Huber's supervision on pages 171-72 of her deposition, Lasko had plainly stated that – *if* a technician had lowered the TV volume – the volume was not low enough to accommodate her sound sensitivity. ECF Doc. 30-16 at 171-72.

As to the claims Lasko actually raised in her complaint, there is a genuine issue of material fact as to whether Mobile Hyperbaric staff and Dr. Huber accommodated her sound sensitivity by lowering the TV volume. Record evidence, viewed in Lasko's favor, indicates that a technician on February 7, 2017, had initially lowered the TV volume to accommodate Lasko's sound sensitivity, but then he *turned the volume back up and told her to deal with it*. *See* ECF Doc. 30-16 at 180, 184-85; ECF Doc. 30-22 at 10; *see also* ECF Doc. 29-1 at 139; ECF Doc. 29-2 at 18; ECF Doc. 31, Video #2 (0:20-1:15). Similarly, record evidence also supports Lasko's claim that the chamber technician refused her request to lower the TV volume during her treatment on February 9, 2017. ECF Doc. 30-16 at 190-91. And, although that evidence is in direct conflict with Lasko's recorded statements that she had *not* made any request related to TV volume but had only asked to choose the channel for 50% of the session as a matter of fairness, the court must resolve the conflicting evidence in Lasko's favor at this time. *Compare* ECF Doc. 30-16 at 190-91, *with* ECF Doc. 31, Video #3 (1:35-1:41, 3:36-4:43), Video #4 (2:00-3:25, 4:45-4:55); *Anderson*, 477 U.S. at 251-52, 255. Thus, Lasko never admitted that Mobile Hyperbaric or its personnel accommodated her sound sensitivity on February 7 or 9, 2017, and the evidence in the record is sufficient to create a genuine issue of material fact on that matter.

Accordingly, the Defendants' motion for summary judgment cannot be granted on the basis that the record evidence conclusively establishes that they accommodated Lasko's sound

sensitivity by lowering the TV volume. *Celotex Corp.*, 477 U.S. at 324  Additionally, although Lasko argues that her request to lower the TV volume was reasonable, the Defendants have raised *no argument*: (1) challenging whether evidence in the record would show that Lasko's requests were reasonable; or (2) showing that the modifications she requested would fundamentally alter the nature of Mobile Hyperbaric's service or facility. *See generally* ECF Doc. 29; *PGA Tour, Inc.*, 532 U.S. at 682.  Thus, the court declines to address those issues at this time. *Cf. Celotex Corp*, 477 U.S. at 324 (placing the burden on the movant).

### 3. Valid Medical or Safety Reason for Terminating Care

#### a. Parties' Arguments

The Defendants argue that they are entitled to judgment as a matter of law because there is no genuine issue of material fact that Lasko's hyperbaric oxygen therapy treatments were discontinued for legitimate medical and safety reasons. ECF Doc. 29 at 21-23.  The Defendants assert that Lasko cannot show that Mobile Hyperbaric ended her treatments for a discriminatory reason, but instead seeks to overturn Dr. Cowap's and Dr. Huber's medical judgment that it would have been potentially dangerous to continue Lasko's treatment in light of her ear pain complaints even after the TV volume was lowered. ECF Doc. 29 at 21-22; ECF Doc. 34 at 10. Further, the Defendants (citing several out-of-circuit decisions) contend that the ADA is not a vehicle through which a patient can challenge medical treatment decisions. ECF Doc. 29 at 22-23; ECF Doc. 34 at 9-10.

Lasko responds that evidence in the record – including Dr. Huber's own statements – shows that Dr. Huber did not base his decision to terminate her treatment on medical reasons, but did so because he did not want to accommodate her request to have the volume on the TV lowered. ECF Doc. 30 at 15-17.  Lasko asserts that Dr. Cowap's and

51

Dr. Huber's June 10, 2020 affidavits are not credible and are unsupported when given that they did not even examine her. ECF Doc. 30 at 15-16. Further, evidence in the record also established that setting the TV to a low volume and "soothing program" adequately accommodated her sound hypersensitivity and enabled her to receive treatment safely – including over 160 "dives" before her treatment at Mobile Hyperbaric in Parma and 30 "dives" after her treatment there was terminated. ECF Doc. 30 at 16.

> b.    *Analysis*

The Defendants' argument that their proffer of a legitimate medical reason for terminating Lasko's treatment entirely bars Lasko from making a claim under the ADA is unavailing. A review of the laundry list of out-of-circuit decisions that the Defendants say support their argument reveals that these cases actually held that the ADA (and Rehabilitation Act) cannot be used as a vehicle to bring a medical malpractice claim or other claim challenging the *quality* of care. *See Burger v. Bloomberg* and *Fitzgerald v. Corr. Corp. of Am.*, 418 F.3d 882, 883 (8th Cir. 2005); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005); *Moore v. Prison Health Servs.*, 201 F.3d 448, 1999 U.S. App. LEXIS 31398, at *3-4 (10th Cir. 1999); *see also Schiavo ex rel Schindler v. Schiavo*, 403 F.3d 1289, 1294 (2005) (holding that a person who was denied life support was not an "otherwise qualified" person under the Rehabilitation Act). In fact, one of the cases that the Defendants cited supports an entirely different conclusion by differentiating between: (1) claims that medical treatment received for a disability was inadequate, which are not actionable under the ADA; and (2) claims that the decision to deny access to treatment was based on the patient's disability, which are actionable under the ADA. *Moore*, 1999 U.S. App. LEXIS 31398, at *3-4 (citing *McNalley v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999) (allowing a claim that the denial of

access to prescription services that were provided to the general population violated the ADA when the denial of services was based on the patient's HIV status); *see also Fitzgerald*, 403 F.3d at 1144 (noting that denial of treatment will "rarely" be actionable when the alleged disability is related to the condition to be treated). And Lasko does not seek to use the ADA or Ohio Rev. Code § 4112.02(G) to bring a claim for faulty medical treatment, but instead alleges that the Defendants denied treatment for her foot pain on the basis of a different disability (*i.e.*, sound sensitivity). Thus, none of the cases the Defendants cited bar Lasko's claim merely because they proffered a legitimate medical explanation for terminating her care.

Instead, when confronted with a defendant's alternative legitimate explanation for its action, a public-accommodation plaintiff must show that the disability discrimination was a "but-for" cause of the adverse event (here, termination from treatment). *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317-21 (6th Cir. 2012) (*en banc*) (rejecting Title VII's "motivating factor" and the Rehabilitation Act's "sole reason" standards for ADA claims) (citing *Gross v. FBL Financial Servs.*, 557 U.S. 167 (2009))[14]; *accord Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019). The plaintiff may do so by showing that the defendant's proffered legitimate explanation is pretextual. *Babb*, 942 F.3d at 320. In doing so, the plaintiff does not attack the credibility of the medical judgment, but whether that

---

[14] In *Lewis*, the Sixth Circuit addressed a failure-to-accommodate claim in the employment context and interpreted the meaning of "because of" as used under the ADA. *See Lewis*, 681 F.3d at 317-21. Since then, the ADA's language has been amended to replace "because of" with "on the basis of." *See Figueroa Guzman v. WHM Carib, LLC*, 169 F. Supp. 3d 304, 308-09 (D.P.R. 2016). Nevertheless, the court sees no reason to treat "because of" and "on the basis of" differently. Likewise, the text of Ohio Rev. Code § 4112.02(G) ("except for reasons applicable alike to all persons regardless of . . . disability") appears more related to the "because of" and "on the basis of" ADA language than it does to the "motivating factor" and "sole reasons" standards under Title VII and the Rehabilitation Act. And neither research nor the parties have revealed a binding decision directing a different interpretation. Thus, the court will – as the Ohio Supreme Court has directed – interpret the language of the Ohio Rev. Code § 4112.02(G) in a manner consistent with the federal court's interpretation of the ADA. *See Columbus Civ. Serv. Comm'*, 82 Ohio St. 3d at 573.

medical judgment was actually the motivating factor for the decision to terminate her treatment. *Cf. McNally*, 46 F. Supp. 2d at 59 (finding that a defendant had not met its burden to show a complete lack of evidence to support the plaintiff's ADA claim because "[a] jury could infer that [the defendant's] policy effectively denie[d] HIV-positive prisoners access to [the defendant's] prescription program . . . because of their particular disability").

With that framework in mind, the court accepts that Dr. Huber and Mobile Hyperbaric management (*i.e.*, Dr. Cowap) may have been motivated – at least in part – by concerns that Lasko suffered pain as a result of HBOT without receiving significant benefit from the treatment and that she engaged in conduct that created safety issues for her and others in the treatment chamber. This is not only supported by Dr. Huber's and Dr. Cowap's affidavit testimony regarding conversations they had with each other, but also: (1) Dr. Huber's recorded statements that he and Dr. Cowap did not want to treat her if she was in pain as a result of treatment; and (2) Dr. Huber's contemporaneously recorded treatment notes indicating that Lasko had engaged in unsafe activities, such as covering her head with a blanket in the treatment chamber and wearing earplugs contrary to safety protocols. ECF Doc. 29-1 at 8-10, 142, 144; ECF Doc. 29-2 at 5-6, 21, 23; ECF Doc. 30-17 at 8, 10; ECF Doc. 31, Video #3 (1:41-1:49, 2:16-2:21, 2:27-2:39). It is also supported by Dr. Ferrini's recorded statements to Lasko. ECF Doc. 31, Video #5.

But Lasko has also met her burden to show that record evidence – construed in her favor – could permit a reasonable juror to conclude that the Defendant's proffered legitimate explanation is pretextual and that disability discrimination was a but-for motivation behind her termination from treatment. Most notably, Dr. Huber's termination letter – whether written by Dr. Huber, Dr. Cowap, or other Mobile Hyperbaric personnel – never mentioned medical or

54

safety concerns as a reason for terminating Lasko's care. *See* ECF Doc.  Instead, the letter:

(1) mentioned only Lasko's requests regarding TV volume and Dr. Huber's belief that she had

also requested to have HBOT in a multiplace chamber without other patients; and (2) expressly

stated that Lasko's treatment was cancelled because Mobile Hyperbaric could not accommodate

her requests. ECF Doc. 29-1 at 145; ECF Doc. 29-2 at 24; ECF Doc. 30-3 at 16.  And

Dr. Huber's recorded statements focusing on Lasko's complaints about TV volume and asking

her why she was "choosing to be difficult" also don't help the Defendants very much. *See* ECF

Doc. 31, Video #2 and Video #3.  Thus, construing the record evidence in Lasko's favor, a

reasonable juror could conclude that the Defendants' proffered legitimate explanation is

pretextual and that the Defendants actually terminated her care because they did not want to

make modifications to their practices to accommodate Lasko's sound sensitivity.[15]

Accordingly, the Defendants have not met their burden to show that there is no genuine

issue of material fact as to whether a legitimate concern about medical treatment actually

motivated their decision to terminate Lasko's care.

### 4.    Qualifying Disability

#### a.    *Parties' Arguments*

The Defendants also argue that they are entitled to judgment as a matter of law on

Lasko's Title III and § 411.02(G) claims because she has failed to produce evidence that her

sound hypersensitivity was a qualifying disability.  ECF Doc. 29 at 23-24.  Specifically, the

Defendants assert that – other than a few medical records which make passing reference to

'hyperacusis" and "phonophobia" – Lasko has not produced any documents or medical records

---

[15] Curiously, the Defendants do not make any argument that Lasko's requested modifications would have fundamentally altered the nature of their service, etc.  *See generally* ECF Doc. 29; *see also PGA Tour, Inc.*, 532 U.S. at 682.  Thus, for the purposes of their motion for summary judgment only, any such argument is forfeited.  *Berkshire*, 928 F.3d at 530

showing that she was diagnosed with such a condition at any time relevant to her claims.  ECF Doc. 29 at 23.  Moreover, the Defendants contend that courts have held that sound sensitivity and other similar hearing conditions are not qualifying disabilities under the ADA or § 4112. ECF Doc. 29 at 23-24 (citing *Northern v. Med. Mut. of Ohio*, 2006-Ohio-1075 (Ohio App. Ct. 2006); *Ratliff v. Ohio Dept. of Rehab. And Corr.*, 133 Ohio App. 3d 304 (Ohio App. Ct. 1999); *Dlugos v. Eastman Kodak Co.*, No. 95-1525, 1996 U.S. Dist. LEXIS 21891 (W.D. Pa. Sep. 5, 1996)).

Lasko responds that her sound hypersensitivity was documented in her medical records. ECF Doc. 30 at 17 (citing ECF Doc. 30-1 at 26, 32-33, 37, 43, 46, 48-49, 53, 55).  Lasko also argues that her sound hypersensitivity was a qualifying disability because it substantially limited her life functions, including: socialization; her ability to go out in public places; her ability to return to her dancing profession; and her need to wear noise cancelling devices in public.  ECF Doc. 30 at 18 (citing ECF Doc. 30-1 at 26, 38, 42-44, 46, 49).  Further, Lasko contends that Oregon and Connecticut courts have found that hyperacusis qualifies as a disability that must be accommodated under Oregon and Connecticut law.  ECF Doc. 30 at 18 (citing *Stamper v. Salem-Keizer*, 195 Ore. App. 291 (Or. App. Ct. 2004); *Perez v. State Judicial Dep't*, No. WWMCV156009136, 2018 Conn. Super. LEXIS 112 (Conn. Super. Ct. Jan. 16, 2018)).

### *b.*    *Analysis*

Under both the ADA and Ohio's disability law, to qualify as a "disability" the plaintiff's condition must be: (1) a physical or mental impairment; (2) that causes a "substantial limitation"; (3) on a "major life activity."  *Hentze v. CSX Transp., Inc.*, No. , 2020 U.S. Dist. LEXIS 141459, at *25-26 (S.D. Ohio Aug. 7, 2020) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); 42 U.S.C. § 12102(1)); *Northern v. Medical Mut. of Ohio*, 2006-Ohio-1075, at ¶17 (Ohio App.

Ct. 2006) (citing Ohio Rev. Code § 4112.01(A)(13)).  Both the ADA and Ohio's disability law specifically innumerate hearing and working to be among "major life activities."  42 U.S.C. § 12102(2)(A); Ohio Rev. Code § 4112.01(A)(13).

In *Ratliff v. Dep't of Rehab. & Corr.*, the Ohio Court of Appeals reviewed the dismissal of a failure-to-accommodate claim under Ohio law in the disability context.  133 Ohio App. 3d 304 (Ohio App. Ct. 1999).  The lower court had held that the need for "[a]bstinence from exposure to loud noise does not constitute a substantial limitation of a major life activity."  *Id.* at 310.  And the Ohio Court of Appeals agreed.  *Id.* at 310-14.  In doing so, the Ohio Court of Appeals reviewed the particular circumstances in the record evidence, namely that: (1) the plaintiff continued to do his normal life activities, including rabbit hunting, watching TV, and attending events at which music was playing; (2) he could tolerate and had stable hearing at conversational  ranges; and (3) he had sold his Harley-Davidson motorcycle, backhoe, and dump truck because of the loud noises they produced.  *Id.* at 310-11.  And, although the plaintiff's physician had written a letter to his employer stating that he was required to wear earplugs and needed to avoid "loud noises" at work due to high-frequency sensitivity, the Ohio Court of Appeals specifically held that "loud noises cannot be considered a major life activity."  *Id.* at 306-07, 311.[16]

Lasko has failed to present evidence sufficient for a reasonable jury to conclude that her sound sensitivity created a "substantial limitation" in a "major life activity."  At first glance,

---

[16] The Ohio Court of Appeals' interpretation of whether abstinence from sound sensitivity qualifies as a substantial limitation on a major life activity is significantly more persuasive (if not binding with regard the Ohio law claim) to this court than decisions from Oregon and Connecticut courts interpreting Oregon and Connecticut law.  And this is so even though much of the land that comprises the Northern District of Ohio was once part of Connecticut.  *See* Western Reserve Historical Society, *available at* https://www.wrhs.org/ about/wrhs-history/?doing_wp_cron=1611699214.2806830406188 964843750 (last visited February 5, 2021).

Lasko's Ohio law claim that her sound sensitivity was a qualifying disability cannot survive as a matter of law in light of the Ohio Court of Appeals' conclusion that abstinence from exposure to loud noise does not constitute a substantial limitation of a major life activity.  *Ratliff*, 133 Ohio App. 3d at 310-11.  But, even without such an express holding, record evidence does not support a conclusion that Lasko's sound sensitivity caused a "substantial limitation" in a "major live activity" under either the ADA or Ohio law.  Although Lasko has stated she preferred to wear earplugs to muffle sounds for her comfort, she has not presented *any* evidence that a physician ever directed her to wear earplugs or to avoid loud/high-pitched noise at any relevant time.[17] ECF Doc. 29-1 at 88-107; ECF Doc. 29-3 at 25-39; ECF Doc. 30-1 at 32-57; ECF Doc. 30-16 at 32-35, 42-45, 54-55, 152; *see also* ECF Doc. 30-9; ECF Doc. 30-10.  When Lasko did finally see an audiologist in April 2018, she was told to *avoid* silence, *discontinue* using sound cancelling devices, and *engage* in sound enrichment.  ECF Doc. 30-1 at 56.  Lasko was able to grocery shop, drive, and watch TV shows that she liked to watch despite her sound sensitivity.  ECF Doc. 30-16 at 38-39, 55; *see also* ECF Doc. 31, Video #3.  Lasko could carry on normal conversations in person and over the phone, without using any ear protection.  ECF Doc. 31, Videos #1-#5; *see also* ECF Doc. 30-1 at 56 (finding that Lasko had normal hearing).  And, although Lasko sold her business and no longer worked, the record shows that her decision to do so was more-closely related to her foot impairments and not related to any physician instructions or limitations stemming from her sound sensitivity.  ECF Doc. 29-1 at 88-107; ECF Doc. 29-3 at 25-39; ECF Doc. 30-1 at 32-57; ECF Doc. 30-16 at 44-45, 54-55, 64.  Thus, Lasko has not

---

[17] The record shows that Lasko was first prescribed earplugs in November 2017 and that her doctor first imposed sound-related restrictions in June 2020 – well after her treatment at Mobile Hyperbaric was terminated.  *See* ECF Doc. 30-1 at 26, 32-34; ECF Doc. 30-16 at 44-45.

submitted sufficient evidence that would allow a reasonable juror to conclude that her sound sensitivity created a "substantial limitation" in a "major life activity."

Because there is no genuine issue of material fact that Lasko's sound sensitivity did not create a "substantial limitation" in a "major life activity," and because the need to avoid loud noise is not a "substantial limitation" in a "major life activity" under Ohio law, the Defendants are entitled to judgment as a matter of law on Lasko's claims under the ADA and Ohio Rev. Code § 4112.02(G).  Accordingly, the Defendants' motion for summary judgment (ECF Doc. 28) must be GRANTED with respect to Lasko's ADA and Ohio law claims.

### 5.    "Owner, Lessor, or Operator" Under Title III of the ADA

Finally, the Defendants argue that they are entitled to summary judgment on Lasko's ADA claim against Dr. Huber because Title III does not impose liability upon individuals and Lasko has not pointed to any evidence that Dr. Huber was an "operator" of a public accommodation.  ECF Doc. 29 at 25; ECF Doc. 34 at 13-15.  Lasko responds that Dr. Huber is liable because, as a medical director at Mobile Hyperbaric's Parma facility, he was the "operator" of a public accommodation.  ECF Doc. 30 at 18-21.

Individual officers of institutions that operate public accommodations are not individually liable as "operators" under Title III of the ADA.  *See Bhan v. Battle Creek Health Sys.*, No. 1:10-cv-202, 2012 U.S. Dist. LEXIS 18088, at *7-8 (W.D. Mich. Feb. 14, 2012) (holding that the chief medical officer, president/CEO, and former CEO of a health system were not personally liable under Title III of the ADA) (collecting cases).  Thus, the court agrees with the Defendants that Lasko has not pointed to any evidence from which a reasonable jury could conclude that Dr. Huber – even as a medical director – was an "operator" of a public accommodation within the meaning of Title III of the ADA.  *Bhan*, 2012 U.S. Dist. LEXIS

18088, at *7-8.  Accordingly, even if this court had not concluded that Lasko lacked standing to bring a claim under Title III of the ADA, the court would nevertheless conclude that the Defendants' are entitled to judgment on Lasko's ADA claim against Dr. Huber.

## IV.    Summary and Conclusion

Lasko's motion to dismiss this case without prejudice (ECF Doc. 24) is DENIED.

The Defendants' motion to strike (ECF Doc. 33) is GRANTED in part, and the following documents are excluded from consideration: (1) the articles and manuals in (ECF Doc. 30-1 at 1-4; ECF Doc. 30-5; and ECF Doc. 30-7); (2) the disability placard and medical infirmity certificate in (ECF Doc. 30-1 at 5-6); (3) the UPMC medical records in (ECF Doc. 30-1 at 6-21); (4) the records from Restorations Physical Therapy (ECF Doc. 30-1 at 23-26); (5) the ComForcare flowsheet (ECF Doc. 30-1 at 57-58); (6) the scooter packing slip (ECF Doc. 30-1 at 60); (7) the United Healthcare letter (ECF Doc. 30-1 at 72); (8) the certificates, articles, photos, letters, and educational information (ECF Doc. 30-1 at 59, 61, 63-71; ECF Doc. 30-4); and (9) the HHS-OCR letters (ECF Doc. 30-3 at 1, 17-19).  The Defendants' motion to strike is DENIED in part as to all other challenged documents.

Lasko's motion to strike (ECF Doc. 37) is DENIED.

The Defendants' motion for summary judgment (ECF Doc. 28) is GRANTED.

Lasko's motion for reconsideration (ECF Doc. 46) is DENIED AS MOOT.

Finally, because Lasko has not yet identified or served the fictitious parties in her complaint (John Does 1-5 and ABC Companies 1-5), and because the time to amend the pleadings expired in May 2019, any claims against those fictitious parties are DISMISSED on the court's own motion.  *See* ECF Doc. 8; ECF Dc. 10; *see also Estate of Romain v. City of*

*Grosse Pointe Farms*, No. 14-cv-12289, 2018 U.S. Dist. LEXIS 36807, at *4 n.1 (E.D. Mich.

Mar. 7, 2018) (sua sponte dismissal of fictious parties).

       **IT IS SO ORDERED.**

Dated: February 25, 2021

                                      Thomas M. Parker
                               United States Magistrate Judge